**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 2004**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

EDWARD HAMLIN,

      Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

      Defendant-Appellee.

No. 02-7087

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 01-CV-476-W)**

---

Submitted on the Briefs:

Michael D. Clay of Tulsa, Oklahoma, for Plaintiff-Appellant.

Sheldon J. Sperling, United States Attorney, Muskogee, Oklahoma; Tina M. Waddell, Regional Chief Counsel, Region VI, Michael McGaughran, Deputy Regional Chief Counsel, and Earnie A. Joe, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Dallas, Texas, for Defendant-Appellee.

---

Before **SEYMOUR**, **KELLY** and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Edward Hamlin seeks review of a denial of disability insurance benefits under Title II of the Social Security Act. Mr. Hamlin filed for benefits in 1993. An administrative law judge (ALJ) denied his claim, and both the Appeals Council and the district court affirmed the ALJ's decision. Mr. Hamlin appeals, raising the same issues he posed before the district court. Essentially he contends the ALJ's rejection of his disability claim was not based on substantial evidence. Specifically, Mr. Hamlin asserts the ALJ erred in finding he had a residual function capacity (RFC) for a wide range of medium work by failing to properly consider the opinions of his treating doctors and in not treating as credible his assertions of disabling pain. We reverse and remand to the Commissioner of the Social Security Administration for further proceedings in accordance with this opinion. [1]

**I.**

Mr. Hamlin contends he is disabled based on severe and constant pain, primarily in his cervical spine and shoulders, and an inability to effectively use his arms. He claims his disability stems from a 1968 motor vehicle accident, has

---

[1]After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

gradually worsened with time, and was exacerbated by a 1983 horseback-riding accident. Mr. Hamlin, who is fifty-five years old, worked as a truck driver and forklift driver until 1984. He did not attempt working again until 1989, when he worked part-time as an egg gatherer for about two years. He was last insured for disability benefits on December 31, 1992.

Mr. Hamlin filed his current application for disability insurance benefits in March 1993, alleging a disability onset date of January 1, 1992. [2] In his disability

_____

[2]Mr. Hamlin first filed for disability benefits in September of 1987, alleging disability as of February 14, 1984, based on "back problems," specifically fractures in his cervical spine and difficulties with his thoracic and lumbar spinal areas. Aplt. App., Vol. II at 83. His application was denied administratively, without a hearing, on December 4, 1987. Mr. Hamlin sought no further review of this decision.

On January 22, 1990, Mr. Hamlin filed his second application for benefits, which was denied on April 5. In his request for reconsideration, he stated that the pain in his back, neck, shoulders, and arms was so severe that his right arm was essentially dysfunctional. He further contended that left shoulder pain severely impaired the function and range of motion in his left arm. After his request was denied, Mr. Hamlin requested a hearing before an administrative law judge.

Mr. Hamlin received a hearing before ALJ Richard J. Kallsnick on August 14, 1990, at which he was assisted by a non-attorney representative. In his November 5, 1990 decision, the ALJ determined there was no good cause to reopen the prior (December 4, 1987) denial and held the relevant period for the 1990 application was from December 4, 1987 through December 31, 1989 (Mr. Hamlin's last insured eligibility date at that time). Following the required sequential evaluation process for disability claims, *see Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988), the ALJ determined that Mr. Hamlin was no longer working (step one); suffered from a severe impairment (step two) that did not meet or equal the listings of 20 C.F.R. § 404, Subpt. P, App. 1 §§ 1.03 and 1.05 (step three); and could not perform his past relevant work (step four). The ALJ concluded at step five, however, that Mr. Hamlin could perform work at

(continued...)

-3-

report, Mr. Hamlin complained of cervical spine fractures, pain in his neck and arms, loss of the use of his arms, and numbness in his arms. He further alleged "nerves" and stated he could not think or understand clearly. Aplt. App., Vol. III at 308. Mr. Hamlin's job listings reflect that he worked part-time from 1989 to 1991 as an egg gatherer in a chicken house. According to his statement, this job consisted of gathering eggs for about thirty minutes, followed by a ten-to-fifteen minute break because of arm pain. Initially he worked about two hours each morning and each afternoon. His wife worked with him, and she tended to most of the other chicken-related chores. Mr. Hamlin stated that toward the end of 1991 he could only work about ten minutes before stopping to rest and by the end of that year, he could no longer work at all.

After benefits were denied, Mr. Hamlin appealed and was afforded a hearing before ALJ Stephen C. Calvarese in April 1994. Mr. Hamlin was assisted by a non-attorney representative. The ALJ held the relevant period for Mr.

---

[2](...continued)
the light vocational level. The ALJ drew support for this conclusion almost exclusively from the medical evaluation report submitted by a Dr. McGovern, a consultative medical examiner. Although the ALJ mentioned reports of other doctors, including plaintiff's treating physicians, the ALJ gave little or no weight to these reports. Based on the Medical-Vocational Guidelines, the ALJ determined that Mr. Hamlin retained an Vocational capacity for the full range of light and sedentary work, which, based on his age, education and work experience, directed a finding of not disabled. Mr. Hamlin sought review before the Appeals Council, which was denied in July of 1991. He did not seek further review of this decision.

Hamlin's disability application was January 1, 1992 (alleged onset date) through December 31, 1992 (last insured date). The ALJ followed the required sequential evaluation process for disability claims, *see Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988), and first determined that Mr. Hamlin was not gainfully employed. At step two, the ALJ determined that no evidence existed showing Mr. Hamlin's anxiety-related disorder resulted in more than slight restrictions of daily living activities and that the disorder was therefore not severe. He nonetheless concluded that Mr. Hamlin's cervical spine compression fractures did severely compromise certain activities, thus satisfying the step-two severity requirement. At step three, the ALJ found no impairment or combination of impairments that satisfied any of the Secretary's listing of impairments. Based on the medical record, including consideration of Mr. Hamlin's allegations of disabling pain, his medications, and testimony at the hearing, the ALJ then concluded at step four that Mr. Hamlin had the RFC for a wide range of light work, but that he could not perform his past relevant work. [3] Moving to the final step in the evaluation, and

---

[3]Pursuant to the federal regulations, light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all

(continued...)

based on hypothetical questions posed to a vocational expert (VE), the ALJ determined that there were light and sedentary jobs, both unskilled and semiskilled (but primarily involving constant use of hands and arms) that Mr. Hamlin was still able to perform. Accordingly, the ALJ held Mr. Hamlin was not disabled. The Appeals Council denied Mr. Hamlin's request for review.

Mr. Hamlin then filed his complaint in district court, alleging the ALJ failed to accord proper weight to his treating physicians' opinions, failed to properly evaluate his RFC, and failed to develop the record with respect to both his mental condition and his past relevant work as an egg gatherer. Based on the parties' disagreement over whether Mr. Hamlin had amended his onset date during the administrative process, the district court determined in March 1997 that there was good cause pursuant to 42 U.S.C. § 405(g) to remand the matter to the Secretary "for the purpose [of] establishing the alleged onset date of

---

[3](...continued)
of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). Sedentary work
involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

[p]laintiff's application for disability." Rec., Vol. I at 49.  The Appeals Council remanded the matter, again to ALJ Calvarese, who conducted a third hearing in Mr. Hamlin's case in October 1997.

The ALJ issued his last decision in February 1998, granting Mr. Hamlin's motion to amend his alleged onset date to December 4, 1987.  The ALJ found no basis for reopening the earlier, unappealed adjudications; hence the "'relevant' period" of Mr. Hamlin's current application dated from November 6, 1990 (the day after the adjudication on the prior application) to December 31, 1992, the last disability insured date.  He then determined there was no evidence Mr. Hamlin had engaged in substantial gainful activity since November 6, 1990. [4]  He next found that although there was no indication of any severe mental disorders, Mr. Hamlin did have severe impairments based on the 1968 cervical spine compression fractures that compromised his ability to lift and carry and to perform more than occasional stooping.  However, these impairments did not satisfy a step-three listing.

Under step four, the ALJ concluded Mr. Hamlin could perform a wide

---

[4]The ALJ made this finding despite the fact that Mr. Hamlin had worked part-time as an egg gatherer between 1989 and 1991.  This finding was also in contrast to the 1994 decision, in which the same ALJ noted Mr. Hamlin had not been substantially employed since January of 1992, presumably including as substantial employment Mr. Hamlin's previous egg gathering duties.  Aplt. App., Vol. II at 20.

range of *medium* work[5] compatible with the demands of his past relevant work. [6]

In reaching this conclusion, the ALJ declined to give weight to the medical opinions of Mr. Hamlin's treating physicians, Drs. Brixey and Underhill. The ALJ also did not give weight to Mr. Hamlin's own statements regarding his disabling pain. Upon determining Mr. Hamlin could perform his prior work in view of his RFC for a wide range of medium work, the ALJ concluded Mr. Hamlin was not disabled for the relevant time period.

Despite his determination that Mr. Hamlin was not disabled under step four, the ALJ noted that "had [Mr. Hamlin] established that he could not perform his past relevant work," Rec., Vol. III at 471, moving to step five would be appropriate. Proceeding under that step, the ALJ posed a series of hypothetical questions to the VE. The ALJ first had the VE assume Mr. Hamlin could lift fifty pounds occasionally and twenty-five pounds frequently (the requirements for an RFC of medium work), could walk or stand six hours a day, had unlimited use of

---

[5]Medium work
involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.
20 C.F.R. § 404.1567(c).

[6]This determination was also in contrast to the ALJ's conclusion in 1994, when the ALJ found that Mr. Hamlin had an RFC for a wide range of light work, but could not perform his past relevant work of egg gatherering or truck driving. Aplt. App., Vol. II at 21, 24.

his arms and legs, and could stoop occasionally. With only those restrictions in place, the VE testified Mr. Hamlin could return to gathering eggs and identified a number of other jobs (sedentary, light, and medium) in the regional and national economies Mr. Hamlin could perform. With greater restrictions somewhat similar to an RFC for sedentary work (including infrequent lifting of up to five pounds, continuous sitting, frequent standing and walking, but no use of arms for repetitive movements and no use of arms or hands for grasping and handling), the VE stated that the only representative example of a job Mr. Hamlin could perform would be that of a surveillance monitor. Based on the ALJ's third hypothetical question, which tracked the requirements for an RFC for light work and included decreases in ranges of motion in the back and neck, the VE concluded that the position of a ticket seller was available. Finally, in responding to the ALJ's fourth hypothetical question, the VE stated no jobs would be available if all of Mr. Hamlin's testimony was credible. The reasons the VE cited for Mr. Hamlin being unable to hold a job included the problems with his right side, his arms and hands "going numb," pain in his back and neck impacting concentration, and Mr. Hamlin's need to lie down daily.

Ultimately the ALJ concluded (apparently in line with his first hypothetical question), that Mr. Hamlin's RFC for a wide range of medium work was compatible with both the demands of his past relevant light work as an egg

gatherer and with a significant number of other jobs considering plaintiff's age, education and previous work experience. The ALJ therefore determined Mr. Hamlin was ineligible for disability insurance benefits. The Appeals Council declined to assume jurisdiction over Mr. Hamlin's case, making the ALJ's February decision the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). The district court denied relief. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g).

## II.

We review the agency's decision "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal*, 331 F.3d at 760 (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotations and citation omitted). However, "[a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). The agency's failure to apply correct legal standards, or show us it has done so, is also grounds for reversal. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). Finally, because our review is based on the record taken as a whole, we will meticulously

-10-

examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking "into account whatever in the record fairly detracts from its weight." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994) (quotation omitted). However, "[w]e may neither reweigh the evidence nor substitute our discretion for that of the [Commissioner]." *Kelly v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

With these principles in mind, we turn to the substance of Mr. Hamlin's appeal in which he argues the ALJ's determination of his RFC was not based on substantial evidence. In particular, Mr. Hamlin contends the ALJ failed to properly consider the opinions of his treating physicians and his allegations of disabling pain.

**A.**

Mr. Hamlin first claims the ALJ failed to give appropriate consideration to the opinions of his treating physicians, Drs. Brixey and Underhill. An ALJ must evaluate every medical opinion in the record, *see* 20 C.F.R. § 404.1527(d), although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic

-11-

techniques and is not inconsistent with other substantial evidence in the record. *Id.* § 401.1527(d)(2). When an ALJ rejects a treating physician's opinion, he must articulate "specific, legitimate reasons for his decision." *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) (quotation omitted). An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion. *See Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). [7]

Additionally, "[w]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Id.* (quotation omitted). "The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Doyal*, 331 F.3d at 762 (quotation omitted). If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it. 20 C.F.R. § 416.927(f)(2)(ii). He must also give good reasons in his

---

[7]These factors, as outlined in 20 C.F.R. § 404.1527(d)(2)-(6), include the length and nature of the treatment relationship, frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.

written decision for the weight he gave to the treating physician's opinion. *Doyal*, 331 F.3d at 762; *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (requiring decision to contain reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.") Finally, even if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the ALJ. *See Groves v. Apfel*, 148 F.3d 809, 810-11 (7th Cir. 1998) (evidence submitted in earlier application for benefits is relevant to subsequent disability application when determining whether claimant is disabled by a progressive condition); *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir. 1987) (per curiam) ("[A]n ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application.").[8] Reviewing the record in light of these

---

[8]We reject the Commissioner's argument that an examination of medical evidence from earlier adjudicated periods somehow reopens Mr. Hamlin's rejected 1990 claim. *See* Aple. Br. at 21. The ALJ made clear that his limited referral to medical documents prior to the coverage period were not made for the purpose of reopening the 1990 decision, Aplt. App., Vol. III at 465, nor did Mr. Hamlin petition for such. *See also Burks-Marshall v. Shalala*, 7 F.3d 1346, 1348

(continued...)

authorities, we conclude the ALJ failed to adequately consider the opinions of Drs. Brixey and Underhill.

Dr. Brixey first examined Mr. Hamlin in January 1985, at which time Mr. Hamlin had "severe pain in the area of his hips, mid-dorsal region and entire cervical spine region," with a "marked limitation of the entire range of motion of the cervical spine in all positions." Aplt. App., Vol. II at 158. Other cervical spine restrictions were noted, along with "pain to palpation of the cervical spine regions of C1, C2, C4, and C7 bilaterally." *Id.* at 159. In reviewing X-rays taken at a Veteran's Administration (VA) hospital, Dr. Brixey noted that the X-rays showed "a compression fracture of several cervical vertebras [sic] with a moderately severe amount of deformity of this region with the subsequent radicular type pain as noted [earlier in the report]." *Id.* Dr. Brixey also found Mr. Hamlin "very obviously has a severe amount of damage to the cervical spine which apparently has been complicated by development of arthritis changes in the injured areas . . . along with the other areas of involvement in both dorsal and lumbar areas." *Id.* Based on the examination and X-rays, Dr. Brixey stated that Mr. Hamlin was "totally and completely disabled and will never be able to return

---

[8](...continued)
n.6 (8th Cir. 1993) (examining evidence from prior claim cannot alone be deemed the reopening of the earlier claim); *Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996) (prior disability claim not deemed reopened merely because evidence from prior decision considered in evaluating new claim).

to his usual occupation of truck driving." *Id.* Dr. Brixey's treatment notes for 1985-1987 appear to reflect primarily refills for medications, but also include notations of pain complaints. *Id.* at 170-73.

Dr. Brixey updated his 1985 report in February 1990, after having seen Mr. Hamlin periodically over five years. Dr. Brixey reported that Mr. Hamlin's "problems are gradually becoming worse with a greater restriction in the range of motion and a greater severity of the pain, particularly of the cervical and mid-dorsal areas." *Id.* at 160. He further noted "radicular type pain into the left arm from the neck region." *Id.* Dr. Brixey anticipated Mr. Hamlin would continue to gradually deteriorate, with "more and more limitation of his mobility." *Id.* He also stated that Mr. Hamlin's prognosis was "somewhat guarded for long-term treatment." *Id.* Dr. Brixey described Mr. Hamlin's range of motion of the dorsal spine, in particular the mid-dorsal area and the entire cervical area, as having a marked limitation. *Id.* He further listed Mr. Hamlin's medications as Voltaren (a nonsteroidal anti-inflammatory), Xanax (for nervousness), and Tylox, "as needed for severe pain." *Id.* In October 1990, Dr. Brixey confirmed his findings based on the results of an MRI performed in the same month. *See id.* at 234-35.

The record further reflects two statements of disability completed by Dr. Brixey–one in 1987 and one in 1990–listing Mr. Hamlin as totally disabled

due to his cervical compression, development of arthritic changes, muscle spasms and marked limitation in his range of motion. *Id.* at 259, 264-67. The prognoses noted a gradual worsening of Mr. Hamlin's condition. Dr. Brixey also found Mr. Hamlin to have "[s]evere limitation of functional capacity, [and to be] incapable of minimal (sedentary) activity." *Id.* at 265.

Finally, in 1997, Dr. Brixey completed an RFC evaluation of Mr. Hamlin for the period from 1987 through 1990, noting that Mr. Hamlin could lift six to ten pounds infrequently, carry eleven to twenty pounds infrequently, infrequently use his arms for reaching, pushing or pulling up to ninety degrees, and infrequently use his hands for grasping, handling, fingering, or feeling. *Id.*, Vol. III at 552-53. In the narrative accompanying the RFC evaluation, Dr. Brixey listed the medical findings supporting his assessment as "marked limitation of range of motion of cervical spine," Mr. Hamlin's inability to lift his "arms above shoulder height," and pain in his middorsal area with any repeated movements. Dr. Brixey offered his opinion that "there is no way this patient can do any prolonged work for gainful employment." *Id.* at 553.

In reviewing this evidence, the ALJ referenced only Dr. Brixey's November 1990 opinion that Mr. Hamlin had been disabled since 1985. The ALJ gave the opinion no weight and rejected it as "brief, totally conclusory, and inconsistent with the overall case record." *Id.* at 467. However, the ALJ failed to provide any

-16-

sufficiently specific reasons as to why he was rejecting Dr. Brixey's opinion.

Nor, in stating that the doctor's opinion was "inconsistent with the overall case record," did the ALJ specifically highlight those portions of the record with which Dr. Brixey's opinion was allegedly inconsistent. At most, the ALJ referred to a consultative report issued by a Dr. Taylor in 1993, in which the doctor explained the limited degrees of flexion/extension and rotation he found in Mr. Hamlin's neck. *Id.* at 347-52. [9] However, that report did not include an RFC analysis, and Dr. Taylor had expressed an opinion in 1990, [10] based on Mr. Hamlin's medical records, that he had "little or no capacity to be gainfully employed." *Id.* at 370. The ALJ did not mention the portion of Dr. Taylor's 1993 report in which the doctor noted his conclusion that Mr. Hamlin had cervical disc disease resulting in a decreased range of motion and associated pain. *Id.* at 348.

---

[9]Dr. Taylor found Mr. Hamlin had a decreased range of neck motion, with only thirty-five degrees flexion and twenty-five degrees extension. Aplt. App., Vol. III at 348. Mr. Hamlin was able to rotate his head forty-five degrees left and right, with crepitation. Dr. Taylor also found Mr. Hamlin's arms and legs to be "within normal limits" and stated Mr. Hamlin was able to manipulate small objects and grasp hand tools. *Id.* at 348-49. The average cervical flexion/extension range is 110 degrees–fifty degrees flexion plus sixty degrees extension. AMERICAN MEDICAL ASSOCIATION, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT, 418 (5th ed. 2001). The average range for rotation is 160 degrees–eighty degrees right and eighty degrees left of center. *See id.* at 421.

[10]Dr. Taylor initially examined Mr. Hamlin in November 1990, noting that Mr. Hamlin's condition had existed for several years. At that time, he concluded it seemed "very clear" that Mr. Hamlin "has changes in his cervical vertebrae that would reduce his normal cervical range of motion by a factor of 15-20 percent." Aplt. App., Vol. III at 370.

-17-

Nor did the ALJ explain why he did not consider Dr. Brixey's 1997 RFC assessment specifically covering the period between 1987 and 1990, which was accompanied by an explanation of Mr. Hamlin's limited range of motion, inability to lift his arms above shoulder height, and pain associated with repeated movements. In addition to discussing evidence supporting his decision, an ALJ must discuss "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). The ALJ failed to do so here.

The record demonstrates that Dr. Brixey's assessments of Mr. Hamlin are fully supported by objective medical evidence. In short, the ALJ improperly rejected Dr. Brixey's opinions because of the ALJ's "*own credibility judgments, speculation or lay opinion*." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)) (emphasis in *McGoffin*).

The ALJ also rejected the medical reports of Dr. Underhill, another treating physician of Mr. Hamlin. Dr. Underhill first saw Mr. Hamlin in March 1990 in the context of determining Mr. Hamlin's eligibility for continued veteran's disability support. In his evaluation, Dr. Underhill reviewed X-rays from 1987

and a 1990 electromyogram (EMG) performed by Dr. Park. [11] In an April 1990 report, Dr. Underhill noted that because of the progressive nature of Mr. Hamlin's disease, he should have been medically discharged from the military after his 1968 motor vehicle accident. Aplt. App., Vol. II at 178-79. Because Mr. Hamlin was forced to continue military training that was "contradictory to his injury," Dr. Underhill reported to the VA that Mr. Hamlin "was entitled to disability." *Id.* at 179.

In an August 1990 addendum to this report, Dr. Underhill noted that Mr. Hamlin's VA medical records, [12] which included a May 1990 X-ray report,

---

[11] Dr. Park, a neurologist, performed the EMG on Mr. Hamlin in March 1990, inserting needles in his right upper arm and cervical area. Aplt. App., Vol. II at 175. His findings were "consistent with a chronic neurogenic process affecting C7 distribution on the right side," suggesting that "cervical disc disease should be considered as a possibility." *Id.*

[12] A 1984 Veteran's Administration (VA) disability evaluation report reflected flexion of the cervical spine as "40 degrees with pain and extension of 30 degrees with pain." Aplt. App., Vol. II at 189. Rotation, also with pain, was measured at forty-five degrees. This report further noted "multiple compression fractures of the cervical spine" and "rather marked spondylosis at the level of C5 and C6" with "impingement on the neural foramen at the level of C5-C6." *Id.* at 191. Progress notes from the VA hospital also reflected Mr. Hamlin's complaints of pain in 1990. *Id.* at 183, 185.

A May 1990 spine series of the cervical spine reflected "deformities involving C3/C4/C5/C6 which is [sic] probably due to old compression-like fractures." *Id.*, Vol. III at 368. Some small fragments of bone were found in the soft tissue. *Id.* A February 1992 X-ray report described "a very peculiar cervical spine" with oddly shaped C3 and C4 vertebral bodies. *Id.* at 394. The review noted "C5 and C6 are very abnormal with both vertebral bodies appearing compressed throughout" and "displaced posteriorly." *Id.*

confirmed Mr. Hamlin's injuries were present when he entered military service. This X-ray report revealed vertebral deformities in C3-C6 and a "fracture of the posterior [spinous] process of C3 and small fragments of bone in the soft tissues." *Id.* at 195. He further stated Mr. Hamlin continued to have evidence of "clinical radiculopathy in the right arm and chronic cervical degenerative arthritis with pain and stiffness." *Id.*

Dr. Underhill also completed a form disability statement in October 1990, listing Mr. Hamlin's disabilities as compression fractures at C3-C4-C5-C6, right C7 radiculopathy and a fracture of the spinous process at C3. *Id.* at 263. In November 1990 Dr. Underhill expressed his opinion, based on his physical examination of Mr. Hamlin and review of his medical records, "including X-rays, EMG and MRI scan of the cervical spine," that it was "reasonable to conclude that [Mr. Hamlin] is unable to engage in any substantial gainful employment because of his disability." *Id*. at 255. Dr. Underhill further stated that Mr. Hamlin's disability existed prior to 1989 and probably prior to the 1987 X-rays. *Id.*

In 1994, Dr. Underhill completed an RFC evaluation for Mr. Hamlin covering the 1992 time period. *Id.*, Vol. III at 396-99. He rated Mr. Hamlin's lifting and carrying ability as "infrequent" for weight up to five pounds and "never" for weight more than that. *Id.* at 396. He rated Mr. Hamlin as unable to

use his arms for repetitive reaching or pushing and pulling and unable to use his hands for repetitive movements such as grasping or handling. In an accompanying narrative, Dr. Underhill based this assessment on Mr. Hamlin's cervical compression fractures, along with development of "severe Degenerative Disc Disease in the Cervical Spine with right C7 Radiculopathy since March 1990." *Id.* at 398. He further noted that Mr. Hamlin had "marked restriction [of] motion in his cervical spine with weakness of his arms and pain in the neck [and] arms daily." *Id.* In Dr. Underhill's opinion, Mr. Hamlin was "permanently disabled and unemployable." *Id.* at 399.

Despite Dr. Underhill's extensive evaluations over the years, the ALJ concluded, again without properly supporting his determination, that Dr. Underhill's reports were brief, conclusory, and inconsistent with treatment records prior to Mr. Hamlin's last insured date. *Id.* at 468. This conclusion is itself inconsistent with the fact that Dr. Underhill submitted an RFC evaluation and based his opinion on objective medical evidence demonstrating Mr. Hamlin's severe compression fractures and severe degenerative disc disease in the cervical spine, with C7 radiculopathy. The ALJ apparently attached significance to Dr. Underhill's RFC notation that Mr. Hamlin's impairments "did not prevent [him] from being able to sit 6 to 8 hours, walk 4 to 5 hours, stand 4 to 5 hours, or sit and stand/walk 6 to 8 hours." *Id.* at 468, 396. The ALJ may not pick and choose

which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability. *See Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).

The ALJ also erred in failing to adequately consider Mr. Hamlin's disability rating by the VA which, although not binding on the Commissioner, is "entitled to weight and must be considered." *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 480 (10th Cir. 1993) (quotation omitted). Both Dr. Brixey and Dr. Underhill found support in the VA records for their evaluations of Mr. Hamlin's condition.

In light of the above, we conclude the ALJ erred by rejecting the medical opinions of Mr. Hamlin's treating physicians without engaging in the proper legal analysis when he made his determination that Mr. Hamlin had an RFC for a wide range of medium work. The ALJ failed to articulate "specific, legitimate reasons for his decision," *Drapeau*, 255 F.3d at 1213, and equally failed to sufficiently highlight how the treating physician's evaluations were inconsistent with the other medical evidence presented in the record. [13] Based on our review of the

---

[13]The Commissioner points to a consultative examination by J.D. McGovern, M.D., conducted on September 17, 1990, in which the doctor concluded that Mr. Hamlin had "no severe neck problem," could stand for extended periods of time, and could lift thirty pounds occasionally and up to fifteen pounds frequently. Aple. Br. at 23-24. The ALJ did not rely on Dr. McGovern's examination in his opinion to support his disregard for the opinions

(continued...)

-22-

record, we conclude the doctor's opinions were supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2).

## B.

Mr. Hamlin next contends the ALJ failed to properly consider his allegations of disabling pain in determining his RFC. We agree. "[T]he claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993) (internal citations omitted). Next, the claimant must show "there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and . . . if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." *Musgrave v. Sullivan*, 966 F.2d

---

[13](...continued)
of Mr. Hamlin's treating physicians; in fact, he did not even mention Dr. McGovern's examination in his decision. Even if Dr. McGovern's opinions are considered, however, they are insufficient to override the treating physicians' opinions in this case. "An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002). Dr. McGovern's opinions do not constitute substantial evidence. In addition, a consultative physician's report should be "examined to see if it 'outweighs' the treating physician's report, not the other way around." *Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988).

1371, 1376 (10th Cir. 1992). While "the absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, . . . a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations." *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987). In the course of determining the credibility of a claimant's statements regarding pain, an ALJ should consider

> 1. [t]he individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *3. *See also Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (listing other factors including "frequency of medical contacts, . . . subjective measures of credibility that are particularly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence"). In summary, an ALJ's "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* at 1133. Here, we are not

-24-

convinced the ALJ's rejection of Mr. Hamlin's allegations of disabling pain was supported by substantial evidence.

In assessing Mr. Hamlin's allegations of pain, the ALJ considered a variety of factors including Mr. Hamlin's significantly reduced activities of daily living, alleged inconsistencies in Mr. Hamlin's testimony at the 1994 hearing regarding his pain, affidavits from individuals who attested to Mr. Hamlin's pain allegations, the role medication may have played in managing his pain, and the fact that Mr. Hamlin "did not require an assistive device for his neck." Aplt. App., Vol. III at 470. In so doing, the ALJ found that Mr. Hamlin's pain testimony was "credible only to the extent consistent with a residual functional capacity for a wide range of medium work activity." *Id.* at 471. Not only do we determine this credibility finding is unsupported by substantial evidence, we also conclude it is contrary to other evidence presented in Mr. Hamlin's record. *See Bernal*, 851 F.2d at 299 ("[a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it").

The ALJ examined Mr. Hamlin's significantly reduced activities of daily living, noting he performed no house or yard work and drove infrequently. Aplt. App., Vol. III at 470. Nonetheless, the ALJ determined that Mr. Hamlin's television watching constituted an activity requiring "significant attention and

-25-

concentration . . . inconsistent with severe and intractable pain." *Id.* There is no medical support whatsoever for this opinion. Nor may an "ALJ . . . rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain." *Thompson*, 987 F.2d at 1490.

The ALJ also noted what he labeled as inconsistencies in Mr. Hamlin's testimony at the 1994 hearing regarding whether he had taken his medication the morning of the hearing and whether he slept three hours a night or four. Aplt. App., Vol. III at 470. Likewise, the ALJ considered doubtful Mr. Hamlin's assertion that "he seldom went to church because he 'hurts too bad to sit' but he was capable of sitting through the 1 hour and 13 minute hearing." *Id.* These discrepancies are minor at best and cannot serve to support a lack of credibility finding. The ALJ did not cite to any medical professionals for the proposition that Mr. Hamlin was exaggerating his symptoms. Moreover, the ALJ failed to note that at the second hearing in 1997, Mr. Hamlin expressed discomfort caused by sitting during the hearing, *id.* at 504, and at one point stood up to stretch, *id.* at 510, and later to walk around, *id.* at 525.

At the second hearing, Mr. Hamlin testified to experiencing constant pain in his shoulder blades and pain when lifting even a cup of coffee. *Id.*, Vol. III at 498. He further testified to limitations on his activities from 1987 and, specifically, the worsening of his condition in 1990 to the point he could not

grasp an egg without dropping it. *Id.* at 506. He testified he tried doing leg exercises as recommended by his doctor but was unable to do so because of the pain. *Id.* at 511. In 1990, he began experiencing numbness in his arms, *id.*, and receiving injections for involuntary muscle spasms, *id.* at 512-13. By then he also needed to modify his recliner by removing the padding and inserting boards so that he could sit without pain. *Id.* at 513. The ALJ made no reference to this testimony despite the fact that Mr. Hamlin's statements went directly to some of the factors an ALJ should consider in making a credibility determination. *See, e.g., Huston*, 838 F.2d at 1132; Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *3.

Finally, the ALJ noted that Mr. Hamlin "did not require an assistive device for his neck." Aplt. App., Vol. III at 470. There is no evidence that any physician recommended such a device or suggested that one would have provided any pain relief. An ALJ is not free to substitute his own medical opinion for that of a disability claimant's treating doctors. *See Miller v. Chater*, 99 F.3d 972, 977 (10th Cir. 1996).

As noted earlier in this opinion, Mr. Hamlin's medical records are replete with his reports of pain and of prescriptions and refills for medication. In addition to the previously listed medications (Voltaren, Tylox, Xanax), Mr. Hamlin was also prescribed Tylenol with codeine (for pain) and Cyclobenzaprine

(for relief of muscle spasms). Aplt. App., Vol. III at 360. [14] Mr. Hamlin reported to a local emergency room facility in October 1990 for relief from severe pain. *Id.*, Vol. II at 238. While medication and therapy may have been effective in alleviating some of Mr. Hamlin's symptoms, *see id.*, Vol. III at 470, this does not necessarily undermine the credibility of his pain allegations. Regardless of his medications, Mr. Hamlin testified to constant pain in his shoulders and arms, which increased whenever he used his arms. *Id.* at 498, 501, 511.

In conclusion, the ALJ's determination that Mr. Hamlin's allegations of disabling pain were of limited credibility is not supported by substantial evidence. Mr. Hamlin's medical records support his allegations of pain and his need for prescriptions to reduce such pain. In contrast, the ALJ's findings regarding Mr. Hamlin's television watching, inconsistencies from the 1994 hearing, and non use of a neck brace, lack substantial evidentiary support and therefore are insufficient to undermine his pain allegations.

## C.

Finally, and in light of the errors considered above, we address Mr. Hamlin's contention that the ALJ was incorrect to find Mr. Hamlin had an RFC

---

[14]Mr. Hamlin's medical records indicate that when he was evaluated in 1986 by Dr. Dean, the doctor noted Mr. Hamlin's medications as Xanax, Norgesic, and Naprosyn. Aplt. App., Vol. II at 163.

for a wide range of medium work. In the course of rejecting the medical opinions of Mr. Hamlin's treating physicians as well as Mr. Hamlin's assertions regarding disabling pain, the ALJ gave "great weight to the remoteness of [Mr. Hamlin's] cervical fractures (1968), his ability to perform work activities as recent as 1989 through 1991 . . . ," and the "lack of a significant traumatic event or evidence of significant progression of his degenerative disc disease recent to his 'relevant' period of November 6, 1990, through . . . December 31, 1992." *Id.* at 469. Likewise, the ALJ concluded there were no diagnostic tests showing Mr. Hamlin was prevented from prolonged standing or walking or occasionally lifting up to fifty pounds, a requirement for medium work. *Id.* at 468.

The emphasis the ALJ placed on the remoteness of Mr. Hamlin's initial injury is irrelevant because he suffered another injury in 1983 (shortly before he was no longer able to drive his truck) and has sought and received continuous treatment for his fractured vertebrae since then. The fact that Mr. Hamlin managed to gather eggs in a six-pound flat intermittently for a few hours a day, with frequent rests and while taking pain medication, simply does not support an RFC for performing a wide range of medium work. And if a condition is already severe, as in this case, a lack of further "significant progression" is also not evidence of an ability to do medium work.

Nor is the RFC finding for medium work supported by the lack of

diagnostic tests showing Mr. Hamlin was prevented from prolonged standing or walking or occasionally lifting up to fifty pounds. In concluding Mr. Hamlin could occasionally lift fifty pounds, the ALJ ignored Dr. Park's 1990 EMG findings indicating right arm radiculopathy, as well as other doctors' findings of Mr. Hamlin's diminished reflex and bilateral grip, and bilateral arm muscle weakness and grasp strength. [15] We do acknowledge these reports did not directly

_____

[15]In 1986, Dr. Dean evaluated Mr. Hamlin and noted an "extreme limitation of range of motion of the cervical spine," a diminished left triceps reflex and a somewhat diminished grip bilaterally. Aplt. App., Vol. II at 163. Dr. Dean found no problems with gross and fine motor movement of the fingers and hands. *Id.* Dr. Dean's diagnosis was status post-cervical vertebrae compression fractures, degenerative disc disease involving C4 and 5 and C5 and 6, and evidence of "minimal radiculopathy involving the C6 radical, manifested by diminished left triceps reflex." *Id.* at 164.

A Dr. Worth examined Mr. Hamlin in August 1990, noting that Mr. Hamlin had seen "multiple physicians in [an] attempt to receive treatment and relief for chronic pain and muscle spasm." *Id.* at 197. These physicians included two neurosurgeons and Dr. Brixey. Dr. Worth's examination confirmed that Mr. Hamlin had "severe neurologic problems bilaterally at [the] C-5/C-6, C-6/C-7 level with paresthesia and muscle weakness bilaterally[,] [m]arked muscle strength loss . . . bilaterally in [his] arms, forearms and hands with grasp strength approximately 30% of normal." *Id.* Dr. Worth further noted Mr. Hamlin's muscle strength loss was "in part due to disuse due to chronic pain as well as neurologic deficits as [a] direct result of injury." *Id.* Based on his examination, Dr. Worth concurred with the other examining physicians that Mr. Hamlin "has severe invertebral disc disease and nerve root impingement." *Id.* Dr. Worth further noted Mr. Hamlin had been advised that "the only help at [the] present time would be a multiple level laminectomy [procedure]." *Id.*

While these medical reports date from an earlier adjudicated period, they are nonetheless part of Mr. Hamlin's case record, and should have been considered by the ALJ. *See* 42 U.S.C. § 423(d)(5)(B) ("the Commissioner . . . shall consider all evidence available in [an] individuals' case record . . ."); 20

(continued...)

-30-

speak to whether Mr. Hamlin was prevented from occasionally lifting up to fifty pounds. But they certainly intimate Mr. Hamlin would be limited in his lifting capacity. Moreover, even if there were no diagnostic tests showing Mr. Hamlin was unable to lift up to fifty pounds, "[t]he absence of [such] evidence is not evidence." *Thompson*, 987 F.2d at 1491. This is particularly true in view of the fact that no treating or examining physician has ever stated that Mr. Hamlin was capable of lifting so much weight. To the contrary, as we have pointed out, Dr. Brixey noted in a 1997 RFC report for Mr. Hamlin covering the years 1987 to 1990 that Mr. Hamlin could only infrequently lift and carry between six and ten pounds. Likewise, in 1994, Dr. Underhill completed an RFC report for Mr. Hamlin for the 1992 period wherein he noted Mr. Hamlin could only infrequently carry or lift up to five pounds, while similarly indicating Mr. Hamlin was wholly unable to lift or carry any increased weight.

The only information from which the ALJ could have determined Mr. Hamlin was able occasionally to lift up to fifty pounds might possibly be gleaned from a 1993 agency disability determination which listed a non-treating physician's assessment of Mr. Hamlin's RFC. There, the reviewing physician

---

[15](...continued)
C.F.R. § 404.1527(d) (every medical source received by the Commission will be considered in evaluating disability claim). *See also Groves v. Apfel*, 148 F.3d 809, 810-11 (7th Cir. 1998); *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir. 1987) (per curiam).

checked a box indicating Mr. Hamlin could occasionally lift up to fifty pounds. *Id.* at 286. The ALJ did not indicate that he reached his fifty pound determination on the basis of the check-off form. If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it. 20 C.F.R. § 416.927(f)(2)(ii). The ALJ did not explain the weight, if any, he attached to this opinion evidence, which stood in direct conflict with the medical opinions of two of Mr. Hamlin's treating physicians. Moreover, we have held that such an evaluation form is insufficient to constitute substantial evidence when it stands alone and unaccompanied by thorough written reports or testimony. *See Frey v. Bowen* , 816 F.2d 508, 515 (10th Cir. 1987) (noting "suspect reliability" of findings of nontreating physician based on limited contact and examination). In this case, the reviewer provided no narrative explanation for any of the conclusions reached.

We find the ALJ's RFC determination problematic and suspect. The ALJ determined Mr. Hamlin had an RFC for a wide range of medium work and could return to his past relevant work of egg gathering as well as perform a variety of other jobs. Aplt. App., Vol. III at 467, 471-72. In contrast, four years earlier this same ALJ found that Mr. Hamlin could perform only a less-than-fully-wide range of light work and could not return to his past relevant work of egg gathering and truck driving. *Id.*, Vol. II. at 25-26. In noting this difference, we do not imply

-32-

the ALJ was bound in his second review of Mr. Hamlin's claim to his earlier RFC decision on remand from the Appeals Council. *See Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir. 1987) (remand order from Appeals Council did not bind ALJ to prior RFC determination). It was certainly within the ALJ's province, upon reexamining Mr. Hamlin's record, to revise his RFC category. In this case, however, the ALJ's revised RFC determination was not supported by substantial evidence.

The ALJ's 1998 decision used almost exactly the same language and relied on nearly the same evidence as the 1994 decision but provided no explanation for why the same evidence would result in a different conclusion. Moreover, the ALJ's failure to give credence to, or specifically and sufficiently explain why he was rejecting, the medical reports and RFC assessments of Mr. Hamlin's treating physicians cannot survive review. *See Drapeau*, 255 F.3d at 1213. Equally detrimental is the ALJ's failure to properly explain why Dr. Taylor's 1993 consultative report or the agency's 1993 RFC determination should be given weight over that of Mr. Hamlin's treating doctors. *See Clifton*, 79 F.3d at 1010; *Goatcher*, 52 F.3d at 290; 20 C.F.R. § 416.927(f)(2)(ii). In short, the ALJ's 1998 RFC determination is not supported by substantial evidence, is contrary to the overwhelming medical evidence in the record, and cannot stand. *See Musgrave,* 966 F.2d at 1374 (holding evidence not substantial if "overwhelmed by other

-33-

evidence in the record").

## III.

In sum, we hold that the ALJ's rejection of Mr. Hamlin's disability claim was not based on substantial evidence. In rejecting the opinions of Mr. Hamlin's treating physicians as well as Mr. Hamlin's assertions of disabling pain, the ALJ erroneously concluded Mr. Hamlin had an RFC for a wide range of medium work. Upon remand, the ALJ must reassess Mr. Hamlin's RFC, as well as determine whether Mr. Hamlin was capable of performing his past work during the relevant time period. If necessary, the ALJ should then proceed to step five of the evaluation process to determine if, given Mr. Hamlin's RFC, jobs exist within the regional or national economy that he could perform. [16]

The judgment of the district court is REVERSED and the cause is REMANDED to the district court with instructions to remand to the Commissioner for proceedings in accordance with this opinion.

---

[16]Given our conclusions, we also overturn the ALJ's alternative finding that had Mr. Hamlin established he could not perform his past relevant work under his medium RFC category, there still existed jobs, including light and sedentary positions, that Mr. Hamlin could perform. We express no opinion as to what the ALJ may determine on remand. Upon reviewing the evidence in light of the proper standards, however, the ALJ may conclude Mr. Hamlin is totally disabled, thereby rendering null any previous determination that Mr. Hamlin could perform work characterized as medium, light, or sedentary.