**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 20, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

THERESA P. HUNTER,

      Plaintiff–Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

      Defendant–Appellee.

No. 08-2209
(D.C. No. 1:07-CV-00588-DJS)
(D.N.M.)

---

**ORDER AND JUDGMENT***

---

Before **LUCERO**, **PORFILIO**, and **ANDERSON**, Circuit Judges.

---

Theresa P. Hunter appeals the district court's order affirming the decision

of the Commissioner of Social Security ("Commissioner") to deny her application

for social security disability insurance benefits. Exercising jurisdiction under

28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

**I**

Before filing the application at issue in this appeal, Hunter had previously

applied for disability insurance benefits, which application was denied on

May 18, 2000. Hunter did not appeal that denial, and therefore res judicata

prohibits reexamination of that final decision.  See Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990) (stating that courts have no "jurisdiction to review the [Commissioner's] refusal to reopen a claim for disability benefits or determination [that] such claim is res judicata").  Moreover, the parties acknowledge that she was last insured for disability purposes on December 31, 2002.  Therefore, the issue is whether Hunter was totally disabled between May 19, 2000, (the day after the adjudication on the prior application) and December 31, 2002.  See Hamlin v. Barnhart, 365 F.3d 1208, 1213 (10th Cir. 2004) (noting that the relevant period ran from the day after the adjudication on the prior application to the last disability insured date); Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir. 1993) (holding that the claimant "must prove she was totally disabled prior to [the date her insured status expired]").

Hunter claims disability due to myofascial pain syndrome, degenerative arthritis, and fibromyalgia.  She asserts that these conditions cause pain and other symptoms in her legs, knees, arms, back, neck, and shoulders.  Her medical history indicates that beginning in 1996, William S. Griffis, D.O., treated her for pain in her back, neck, and right shoulder.  In 1999, Terri Weber, M.D., began treating her for neck, back, shoulder, and knee pain.  Dr. Weber diagnosed muscle spasms and prescribed narcotic pain medications.  Dr. Weber continued to treat Hunter for several years, encompassing the period relevant to this case.

-2-

Beginning in 1999, Hunter also sought treatment for neck, back, wrist, and knee pain from Steve J. Petrakis, M.D.  Like Dr. Weber, Dr. Petrakis also prescribed narcotic pain medications and continued to treat Hunter during the relevant period.

In July 2002, Hunter underwent surgical treatment for blood clots.  The surgery was performed by Nathan L. Brightwell, M.D., who continued to treat Hunter for post-operative problems.  Those problems were resolved in the ensuing months.  During her hospitalization, Hunter revealed that she had been receiving prescription narcotic pain relievers from both Dr. Weber and Dr. Petrakis, whereupon she consulted with Ronald M. Laub, M.D., about pain management.  Dr. Laub noted back and neck tenderness, and he prescribed methadone to help Hunter overcome her dependence on narcotics.

In addition to her own doctors, Hunter was evaluated by two physicians consulting for the Commissioner.  The first evaluation was performed in April 2000 by Anthony Caruso, M.D.  Upon examination, Dr. Caruso found tenderness in Hunter's back, neck, and shoulders.  He indicated that she suffered from fibromyalgia, but found, among other things, that she had "full range of motion and full strength," and that she had no sitting restrictions.

The second consulting physician was John Burris, M.D., who examined Hunter on August 10, 2002.  He diagnosed chronic neck, upper back, and bilateral arm pain, noting that Hunter had no functional deficits and that her neurologic

exam was normal in the upper extremities. He found "no restrictions from sedentary duties," and "[n]o limitation to fine manipulation work."

An Administrative Law Judge ("ALJ") initially denied Hunter's application for disability benefits on August 29, 2002. Hunter appealed and on February 21, 2006, the district court remanded the case for further proceedings. At the remand, Hunter was represented by counsel and testified, as did a vocational expert ("VE"). The ALJ determined that as of December 2002, Hunter had the ability to perform medium work and could return to her past work as a customer service representative. After considering Hunter's medical history and hearing testimony, the ALJ denied benefits at step four of the five part sequential evaluation process. See Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five step process). The district court affirmed.

## II

We review the Commissioner's decision to ascertain whether it is supported by substantial evidence in the record and to evaluate whether he applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted). To determine whether substantial evidence supports the Commissioner's decision, we examine the record as a whole, but do not reweigh the evidence. Id.

-4-

In this context, "disability" requires both an "inability to engage in any substantial gainful activity" and "a physical or mental impairment, which provides reason for the inability." Barnhart v. Walton, 535 U.S. 212, 217 (2002) (quotation omitted). Impairment must be a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "The claimant bears the burden of proving a disability within the meaning of the Social Security Act." Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984).

In determining whether a claimant is disabled, the Commissioner employs the familiar five step sequential evaluation process. Fischer-Ross, 431 F.3d at 731 (describing the process). The Commissioner determined at step four that Hunter was not disabled.

> Step four of the sequential analysis . . . is comprised of three phases. In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996) (citation omitted).

Before us, Hunter claims that the ALJ made two fundamental errors at step four. First, Hunter disputes the ALJ's conclusion that she can perform her past

relevant work. Specifically, Hunter contends that the ALJ erred (1) in determining that she could perform medium work, (2) in failing to make findings regarding the demands of her past work as a customer service representative, (3) in concluding that her limitations in fingering and manipulation do not prevent her from performing her past work, and (4) in failing to include sitting restrictions in a hypothetical question to the VE. Second, Hunter maintains that the ALJ improperly discounted her claims of pain and subjective complaints by finding her testimony not credible.

**A**

Hunter objects to the ALJ's finding that she retained the RFC to perform medium work.[1] We need not address this dispute because the parties agree that Hunter's past work as a customer service representative fell into the sedentary category rather than the medium work category. Even if the ALJ should have concluded that Hunter had an RFC for only sedentary work, she would still be able to perform her past relevant work. Thus, any error on this point was harmless.[2] See Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004)

---

[1] RFC is defined as "the most [a person] can still do despite [his or her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1).

[2] Consequently, we do not address Hunter's argument based on the combined effect of her blood clots, knee pain, and limitations on her abilities to stand and walk because that argument challenges only the ALJ's determination that she could do medium work.

(recognizing the appropriateness of harmless error analysis in administrative cases).

Hunter also alleges that the ALJ's findings are inadequate because he described what her past work did <u>not</u> demand, rather than making affirmative findings as to what physical and mental requirements the work <u>did</u> demand. She further argues that the ALJ acted impermissibly by adopting the VE's testimony on certain points. We do not agree.

The ALJ explicitly found that Hunter's past work as a customer service representative did not require the lifting expected for medium work; rather, the lifting and carrying requirements were less than ten pounds. In addition, the work required no standing or walking. The ALJ also adopted the VE's testimony that Hunter's description of her work was compatible with the <u>Dictionary of Occupational Titles</u> ("DOT") and with his experience, although the work as she performed it required more use of her fingers than most customer service representative positions in the national economy. As described in the DOT, the position would require occasional "fingering." Finding this argument to be unsupported by the medical evidence, the ALJ then rejected Hunter's claim that her limitations on "fingering" and manipulation precluded her from performing her past work.

We conclude that the ALJ's findings relative to the physical and mental demands of Hunter's past relevant work are adequate. By adopting the VE's

-7-

testimony, he did not abrogate his responsibility to make specific findings. See Doyal v. Barnhart, 331 F.3d 758, 761 (10th Cir. 2003) (holding it was not improper for an ALJ to "quot[e] the VE's testimony approvingly[] in support of his own findings" because an "ALJ may rely on information supplied by the VE at step four" (quotation omitted)).

Hunter's third contention on point is that the ALJ improperly rejected her claim that she cannot adequately perform the "fingering" and manipulation required in her past work. She relies on reports regarding such limitations from Drs. Griffis and Weber. Dr. Griffis's report, dated September 12, 1996, noted that Hunter had developed right wrist and arm pain in 1991 that had been treated successfully in the past, and he referred her to another physician for treatment. Dr. Weber noted on November 20, 1997, that Hunter reported neck and shoulder pain.

Hunter also cites to a report by physical therapist Brad Chewakin in September 1998 noting "significant myofascial irritability in the upper quadrant right greater than the left." In addition, she points to a September 1998 diagnosis of cervical facet syndrome with locking of atlantoaxial joint (cervical vertebrae) and myofascial pain syndrome, and an April 2000 x-ray showing degenerative disease of the cervical and lumbar spine.

All of this medical evidence comes from outside the relevant period, May 18, 2000, to December 31, 2002. Such evidence is pertinent only if it illuminates

the claimant's condition during the relevant period. None of the medical sources on which Hunter relies offered an opinion about her "fingering" and manipulation within the relevant period, whereas Dr. Burris, a consulting physician who examined Hunter <u>during</u> the relevant period, stated that "[h]er neurologic exam is completely normal in the upper extremities [and] functionally she has . . . normal strength, reflexes, and movement." Based on this record, we conclude that substantial evidence supports the ALJ's determination that Hunter was not prevented by limitations in "fingering" and manipulation from performing her past work.

It is claimed that the ALJ erred by failing to include Hunter's sitting restrictions in a hypothetical question to the VE. Hunter maintains that it was error for the ALJ to rely on the assessment performed by physical therapist Mary Bogenschultz-Bonn and on Dr. Burris's report, neither of which imposed a restriction on sitting, instead of questioning the VE on this topic. "To the extent that she is asking this court to reweigh the evidence, we cannot do so. We review only the <u>sufficiency</u> of the evidence, not its weight; and there was certainly enough evidence to support the ALJ's findings." <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1257 (10th Cir. 2007) (citation omitted). Moreover, the ALJ was not required to include in a hypothetical question limitations "not accepted by the ALJ as supported by the record," <u>Bean v. Chater</u>, 77 F.3d 1210, 1214 (10th Cir. 1995), including the sitting limitation urged by Hunter.

Accordingly, we conclude that Hunter has failed to carry her "burden of proving her inability to return to her particular former job and to her former occupation as that occupation is generally performed throughout the national economy." O'Dell v. Shalala, 44 F.3d 855, 860 (10th Cir. 1994) (quotation and alteration omitted); see Henrie, 13 F.3d at 361 (claimant has burden of proof).

**B**

Hunter also objects to the ALJ's finding that her complaints of disabling pain were not credible. It is well-established that "[c]redibility determinations are peculiarly the province of the finder of fact." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). Even so, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (alteration omitted).

In discrediting Hunter's hearing testimony, the ALJ relied on her statement that she had not been addicted to narcotic pain medications during the relevant period, despite abundant evidence that she was. The ALJ meticulously catalogued her receipt of prescription pain medications from both Dr. Weber and Dr. Petrakis during the relevant period. Dr. Petrakis required Hunter to sign a contract with him on October 7, 2002, whereby she agreed to obtain prescription medications only from him after he discovered that she was also receiving narcotics from another physician. In July 2002, Dr. Laub consulted with Hunter for pain management, noting her "[n]arcotic addictive behavior, physician shopping." On

February 25, 2003, Dr. Weber informed Hunter "that one pill a day of Percocet is all [she] will allow her because of the history of drug addiction." Hunter did not list Dr. Petrakis as a treating physician on her disability application, even though he had treated her since January 1999, nor did she indicate on the application the medications he had prescribed for her.

We are directed to medical evidence that Hunter has several pain producing impairments. The ALJ recognized that her impairments were capable of producing pain. But he gave little weight to the opinions of treating physicians Weber and Petrakis because neither physician knew that Hunter was receiving narcotic medications from the other, so "[i]t would have been impossible for the physicians to fully assess the claimant's physic[al] condition and complaints without the knowledge of the drug abuse." The ALJ determined that during the relevant period, Hunter "was doctor shopping and not informing physicians of the care and medications she was receiving from other doctors." Thus, the ALJ gave legitimate reasons in his written decision for concluding that the treating physicians could not assess whether Hunter needed strong medication for severe pain or whether her requests for prescription medications were based on her addiction.

Hunter maintains that in evaluating her credibility the ALJ was required to give "significant consideration" to the opinion of Daniel St. Arnold, M.D. The ALJ gave no weight to the opinion of Dr. St. Arnold because he did not start

treating Hunter until three years after her insured status expired, he provided no specific limitations, and he cited to no specific findings. In addition, Dr. St. Arnold's opinion that Hunter was unable to work was based on Hunter's own statement, and the ALJ found her not to be credible.

Instead of crediting Dr. St. Arnold's opinion, the ALJ credited the opinions of the consulting physicians, Drs. Caruso and Burris, who examined Hunter in 2000 and 2002, respectively. The ALJ noted that "both consultative examiners found that the claimant was not functionally impaired by the pain,"[3] and properly explained the weight he gave the medical opinions. See 20 C.F.R. § 404.1527(b), (d). Thus, the ALJ gave "specific, legitimate reasons for his decision." Hamlin, 365 F.3d at 1215 (quotation omitted). In sum, based on our review of the record as a whole, we conclude that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence.

---

[3] The ALJ also briefly noted that in 1997 Dr. Griffis found that Hunter was not motivated to perform strengthening exercises. Hunter maintains this observation was unfair and incorrect because she did some of the recommended exercises. We do not analyze this argument because Dr. Griffis's report is well outside the covered time period, and this specific point of contention relates to Hunter's subjective motivation in 1997, rather than to her physical condition.

**III**

For the reasons stated, the judgment of the district court is **AFFIRMED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge