**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TERRY D. ANDERSEN,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,[*]

      Defendant-Appellee.

No. 05-4305
(D.C. No. 2:04-CV-960-DAK)
(D. Utah)

**ORDER AND JUDGMENT**[**]

Before **MURPHY**, **HARTZ**, and **HOLMES**, Circuit Judges.

Claimant Terry D. Andersen appeals from the district court's order

affirming the decision of the Social Security Commissioner to deny his

application for disability insurance benefits ("DIB"). Mr. Andersen argues on

appeal that the administrative law judge ("ALJ") failed to properly evaluate the

opinions of his treating physicians, posed inadequate hypothetical questions to the

---

[*] In accordance with Fed. R. App. P. 43(c)(2), Michael J. Astrue is substituted for Jo Anne B. Barnhart as defendant in this appeal.

[**] This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

vocational expert, and erred in finding Mr. Andersen not totally credible. We exercise jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g) and conclude that the ALJ erred by failing to follow the proper procedures for considering the opinions of Mr. Andersen's treating physicians. Accordingly, we **REVERSE** and **REMAND** for further proceedings.

## I. BACKGROUND

Mr. Andersen protectively filed for DIB under Title II of the Social Security Act in August of 2000. He claimed he had been unable to work since May 4, 1993, primarily due to fatigue and shortness of breath following three open heart surgeries and related impairments that include aortic valve disease, several mini-strokes, and blindness in his left eye. After his application was denied both initially and upon reconsideration, he requested and received a hearing before an ALJ.

The hearing focused on the evidence surrounding Mr. Andersen's abilities on December 31, 1998, which was the date on which Mr. Andersen's insurance for disability benefits expired, in determining Mr. Andersen's residual functional capacity ("RFC") for purposes of steps four and five of the now-familiar sequential evaluation process. *See, e.g.*, *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). Following the hearing, the ALJ agreed that Mr. Andersen had severe impairments due to his history of mitral valve disease and rheumatic heart disease, his chronic obstructive pulmonary disease, and left eye blindness.

- 2 -

However, the ALJ concluded that Mr. Andersen could perform a significant range of light work, and because there were jobs in the national economy that he could perform, he was not under a disability as defined in the Social Security Act.

In reaching this conclusion, the ALJ embraced the opinion of the non-examining, agency physician, who discounted "several disability forms" from "the remote past" that indicated Mr. Andersen could perform no work or was limited to sedentary work. Aplt. App. at 18. The agency physician also concluded that these forms "were not substantiated by the objective evidence and were entitled to little weight." *Id.* The agency physician found Mr. Andersen to have an RFC for light exertional work based solely on a review of his medical records. The ALJ appeared to concur with all of these opinions of the agency physician.

The ALJ also reviewed reports from Mr. Andersen's treating physicians, although not accepting the conclusions of these physicians as the ALJ had done with the agency physician's opinion. The ALJ observed that the medical records from Mr. Andersen's treating physician for 1998 were "very vague, sparse, and not suggestive of disability." Aplt. App. at 20. The ALJ also described—and apparently rejected—two treating physician opinions from June 1999 and September 2000. In June 1999, Mr. Andersen's primary care physician opined that Mr. Andersen was disabled. However, the ALJ determined "there are no clinical reports to show this," noting as well that the form showed only mild or moderate symptoms. *Id.* In September 2000, Mr. Andersen's cardiologist

completed a form indicating severe restrictions with respect to how much Mr. Andersen could stand or walk in the workplace, but the ALJ described the assessment as "very confusing" and "inconsistent." *Id.*

In light of these assessments, the ALJ concluded, at the fifth step of the applicable sequential process, that Mr. Andersen had an RFC for a limited range of light work and was capable of performing jobs that are available in significant numbers in the national economy.[1] The ALJ cited "the sparse and mild medical reports" and Mr. Andersen's lack of specific memory of his capabilities in 1998 during his testimony in 2002 in reaching the conclusion that Mr. Andersen had failed to provide proof of total disability. *Id.*

The Appeals Council denied Mr. Andersen's request for review, rendering the ALJ's decision the final decision of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Mr. Andersen then filed this action in federal court, and the district court affirmed the ALJ's decision. In part, the district court held that the ALJ sufficiently discussed the opinions of Mr. Andersen's treating physicians and provided specific, legitimate reasons for rejecting them. The district court also concluded that there was no duty to recontact Mr. Andersen's cardiologist about inconsistencies in his opinion

---

[1] In coming to this conclusion, the ALJ relied on the testimony of a vocational expert who indicated that some of the jobs that might be available to Mr. Andersen included an office helper, information clerk, parking lot attendant, and housesitter. The vocational expert's testimony was elicited through hypothetical questions posed by the ALJ.

because the record as a whole was adequate for a decision. The district court found sufficient indication that the ALJ reviewed the numerous echocardiogram and heart catheterization results, noting both that the ALJ appeared to rely on these results at step two in the applicable process and that the ALJ found that Mr. Andersen had severe impairments. This appeal followed.

## II. DISCUSSION

In our review of the ALJ's decision, we must determine if the ALJ has "applied the correct legal standards" and also if the ALJ's "factual findings are supported by substantial evidence in the record viewed as a whole." *Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007) (internal quotation marks omitted). "The agency's failure to apply correct legal standards, or show us it has done so, is [] grounds for reversal." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).

In reviewing the ALJ's decision, we may "neither reweigh the evidence nor substitute our judgment for that of the agency." *Frantz*, 509 F.3d at 1300 (internal quotation marks omitted). We must avoid a "post hoc effort to salvage the ALJ's decision," lest we "overstep our institutional role and usurp essential functions committed in the first instance to the administrative process." *Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004) (internal quotation marks omitted). Indeed, we should evaluate an ALJ's decision "based solely on the reasons stated in the decision." *Id.* at 1084.

Accordingly, when an ALJ is considering a treating physician's opinion, the ALJ is required to "give good reasons in the notice of determination or decision for the weight assigned to a treating physician's opinion." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotation marks and alteration omitted). These reasons must be specific and legitimate. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). We require a level of specificity that is sufficient "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 (internal quotation marks omitted). In the absence of these reasons, we cannot determine if there is relevant evidence that adequately supports the ALJ's conclusion or if the ALJ even applied the proper legal standard to arrive at that conclusion. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Thus, where an ALJ has failed to articulate these reasons, we must remand. *See id.*; *Watkins*, 350 F.3d at 1301. "We cannot simply presume the ALJ applied the correct legal standards," and "we cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion." *Watkins*, 350 F.3d at 1301.

On appeal, Mr. Andersen argues that the ALJ erred in three ways: (1) failing to give his treating physicians' opinions appropriate evidentiary weight; (2) posing inadequate hypothetical questions to the vocational expert; and (3) finding Mr. Andersen's testimony regarding his limitations not totally credible.

We conclude that the ALJ erred in failing to properly determine the weight ultimately assigned to Mr. Andersen's treating physicians' opinions. *See Watkins*, 350 F.3d at 1301. Accordingly, we must remand. *See id.* Because we remand on this first issue, we will not reach the remaining issues because they may be affected by the ALJ's treatment of the case on remand. *See Robinson*, 366 F.3d at 1085.

## A. Evaluation of Treating Physician Opinions

"Treating source medical opinions are [] entitled to deference," and must be either given controlling weight or assigned some lesser weight "using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. To ensure that these opinions receive proper deference, an ALJ reviewing the opinions of treating sources must engage in a sequential analysis. *Watkins*, 350 F.3d at 1300.

First, an ALJ must determine whether the opinion deserves controlling weight. *Id.* Controlling weight must be given if the opinion is both supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). If both of these conditions are met, no other factors need be considered and the inquiry is at an end. *See id.*; *Watkins*, 350 F.3d at 1300.

However, if one or both of these conditions is lacking, an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt. Instead,

the ALJ must proceed to a second determination, where the ALJ must both (1)

weigh the opinion "using all of the factors provided in 20 C.F.R. § 404.1527 and

416.927" and (2) "give good reasons in the notice of determination or decision for

the weight [the ALJ] ultimately assigns the opinion." *Watkins*, 350 F.3d at 1300-

01 (internal quotation marks and alteration omitted).

As summarized in *Watkins*, the regulatory factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

350 F.3d at 1301 (internal quotation marks omitted).

Although the ALJ's decision need not include an *explicit discussion* of each

factor, *see Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), the record

must reflect that the ALJ *considered* every factor in the weight calculation.[2] *See*

---

[2] In *Oldham*, we stated: "That the ALJ did not *explicitly discuss* all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review." 509 F.3d at 1258 (emphasis added). In a given case, of course, not all of the regulatory factors may be relevant to the ALJ's determination of the weight to assign to the treating physician's opinion. *See id.*; *cf.* SSR 06-03p, 2006 WL 2329939, at *5 (referring to regulatory factors generally applied in weighing opinion evidence in the context of providing guidance as to non-medical sources; noting that "[n]ot every factor for weighing opinion evidence will apply in every case").

(continued...)

- 8 -

Furthermore, in some cases, certain key factual circumstances may substantially shape—if not definitively define the contours of—the lens through which the ALJ considers the regulatory factors in the weight-assignment process. Indeed, the regulations appear to contemplate this possibility in that they expressly include along with the treatment-related and physician-related factors a component for other "factors brought to the ALJ's attention which tend to support or contradict the opinion," *Watkins*, 350 F.3d at 1301 (the sixth *Watkins* factor), and do not purport to rank the factors in terms of importance. Offering an example, the regulations note that these other factors may relate to "the extent to which an acceptable medical source is familiar with the *other information*" in the claimant's record. 20 C.F.R. § 404.1527(d)(6) (emphasis added).

These principles animated our decision in *Oldham*, where "[t]he credibility issue was critical to the determination of disability." 509 F.3d at 1257. Powerful evidence in the record—including videotapes that "showed her [Ms. Oldham] engaging in physical activity far beyond the capacity that she had reported to her various medical providers"—quite reasonably led the ALJ to seriously question Ms. Oldham's credibility. *Id.* Ms. Oldham did "no[t] contest the ALJ's findings that her 'allegations, statements and presentations, including those made to treating and examining doctors[,] [were] highly unreliable,' . . . and that her 'allegations regarding her limitations [were] not totally credible[.]'" *Id.* (alterations in the original) (quoting Administrative Record, Vol. I, at 28, 44). This overarching credibility issue led the ALJ to give "'very little weight' to opinions from various treating physicians regarding her functional capacity," because those physicians did not have the benefit of the powerful contrary record evidence that severely undercut Ms. Oldham's disability assertions, but instead had placed significant reliance upon Ms. Oldham's unreliable statements. *Id.* at 1258. Coupled with the ALJ's "citation to contrary, well-supported medical evidence," we concluded that the ALJ's findings "satisfie[d] the requirement that the ALJ's decision be 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting *Watkins*, 350 F.3d at 1300).

In *Oldham*, on the record "in th[at] case," *id.*, we could be confident that the ALJ *considered* all of the regulatory factors, although the ALJ "did not *explicitly discuss* all" of them, *id.* (emphasis added), because we tacitly

(continued...)

20 C.F.R. § 404.1527(d)(2) ("[W]e apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion."); SSR 96-2p, 1996 WL 374188, at *4 ("Treating source medical opinions . . . must be weighed using *all* of the factors provided . . . ." (emphasis added)).  The decision must articulate the ALJ's reasoning such that later reviewers can identify both the weight that was actually assigned to the opinion and the reasons for that weight. *See* SSR 96-2p, 1996 WL 374188, at *5.[3]

## B.  Mr. Andersen's Treating Source Opinions

---

[2](...continued)
recognized that the lens through which the ALJ considered the factors was substantially shaped *and* severely constricted by the "critical" factor of Ms. Oldham's established mendacity. *Id.* at 1257.  Looking through a lens thus shaped, the ALJ could have reasonably determined that most of the explicit treatment-related and physician-related regulatory factors (as enumerated in *Watkins*, factors 1, 2, and 5) were largely irrelevant and not worthy of discussion, because the treating physicians offered their opinions based upon Ms. Oldham's false premises.  And, as for the factors that focused on the opinions' record support and congruence with other record evidence (respectively, *Watkins* factors 3 and 4), the ALJ quite reasonably could have viewed them as unequivocally supporting the decision to assign "very little weight" to the treating physicians' opinions.  And, as evident by the passage quoted above, the ALJ's consideration of these factors was patent in the reasons that the ALJ offered for that weight assignment.  Therefore, our decision in *Oldham* is entirely consistent with the proposition that, although the ALJ's decision need not include an *explicit discussion* of each factor, the record must permit us to reach the conclusion that the ALJ *considered* all of the factors.

[3]        This applies at least where the decision is not fully favorable to claimant.  The regulations contemplate a briefer explanation if the decision is fully favorable and the opinion in question is of marginal importance to that decision.  *See* SSR 96-2p, 1996 WL 374188, at *5.

Mr. Andersen was seen by at least four different physicians, including his cardiologist, from 1993 to 2000. Over this period, these physicians uniformly agreed that he was unable to work and provided largely consistent descriptions of his physical limitations. However, the ALJ paid virtually no attention to these congruous evaluations by Mr. Andersen's treating physicians. Although the ALJ may assign these opinions lesser weight or disregard them, this can only be done when the ALJ has (1) made a ruling that the opinion is not entitled to controlling weight and (2) after considering the pertinent factors, provided "good reasons" for the weight ultimately assigned to the opinion. *See Watkins*, 350 F.3d at 1300-01. We conclude that the ALJ's analysis is insufficient for us to be satisfied that the ALJ properly followed this process in giving the opinions so little weight.[4]

### 1. Dr. Wren's and Dr. Woods's Opinions, 1993 to 1997

The administrative record in this case contains annual assessments of Mr. Andersen's condition for the years 1993 through 1997, which were apparently completed at the request of his private disability insurer. Dr. Michael Wren, an internist, completed an "attending physician statement" each year from 1993 through 1996, along with cardiovascular medical reports describing the results of echocardiograms in 1993 and 1996. After 1996, two other physicians in the same medical group succeeded Dr. Wren as Mr. Andersen's primary care physician: Dr.

---

[4]     Although the ALJ never made a finding regarding whether the opinions received controlling weight, it is clear that the ALJ did not give any of the opinions of these four treating physicians controlling weight.

- 11 -

Daniel Woods, who saw Mr. Andersen on October 27, 1997, and Dr. Charles

Hodges, who cared for Mr. Andersen thereafter.[5]

In 1993, Dr. Wren concluded that Mr. Andersen likely could not return to

his former occupation. However, he determined that in a job that required less

vigorous activity, Mr. Andersen could work eight hours per day; walk for three or

four of those hours; and sit, stand, or bend without limitation. One year later, in

1994, Dr. Wren changed his assessment, concluding that Mr. Andersen could only

do sedentary work, that he could work only "perhaps one" hour per day, and that

he could only walk or stand for half an hour during that time. Dr. Wren's 1995

and 1996 assessments matched his 1994 conclusions. Dr. Wren's notes for his

1995 assessment state that "APS confirms current limits - shortness of breath with

minimal exertion" and that his last echocardiogram in 1993 "confirms valve

disease." Aplt. App. at 102.[6]

Dr. Daniel Woods saw Mr. Andersen on October 27, 1997, which is

memorialized by both his examination notes and a work assessment contained in

---

[5] Dr. Hodges's opinion will be addressed separately. *See infra* Section II.B.2.

[6] The ALJ may not have associated this note with Dr. Wren's assessment. By its placement in the record, it appears that the date was determined to be "6/1/99," the date of Dr. Hodges's assessment, which cannot be correct. Numerous indicia confirm its timing as either 1994 or 1995: (1) Mr. Andersen, who was born in 1948, is listed as "age 46"; (2) the last test is listed as taking place in December of 1993, indicating the visit must have occurred before the June 1996 echocardiogram; and (3) the handwritten date also could be read as "8/11/95," the date of the 1995 assessment.

the administrative record. Dr. Woods concluded that Mr. Andersen could sit for one hour and walk or stand for half an hour. He also marked Mr. Andersen's limitations as "Class 4 - Moderate limitation of functional capacity: incapable of minimal (sedentary) activity[] (75-100%)." Aplt. App. at 116.

The ALJ largely disregarded the opinions of Dr. Wren and Dr. Woods.[7] Accepting the non-examining agency physician's view that these opinions "were not substantiated by the objective evidence and were entitled to little weight," the ALJ further added that "[t]here are forms in the record with check off boxes but there is no rational[e] or little reasoning for the limitations assessed." *Id.* at 18. Additionally, the ALJ concluded that these opinions were temporally distant and of little utility.

It is apparent that the ALJ concluded that these opinions were not entitled to controlling weight. Although ordinarily the ALJ should have made explicit findings to this effect, *see Watkins*, 350 F.3d at 1300 (noting that "[a] finding at this stage (as to whether the opinion is either unsupported or inconsistent with

_____

[7] We note that the record only provides one instance in which Dr. Woods examined Mr. Andersen. However, neither the ALJ nor the Commissioner raised any question about whether Dr. Woods should be deemed a treating physician. Thus, for purposes of this appeal, we assume that Dr. Woods was one of Mr. Andersen's treating physicians, and we will not apply our general principle that "the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003). However, we do not purport to usurp the ALJ's role to make this determination in the first instance, nor do we foreclose further consideration of this issue on remand.

other substantial evidence) is necessary so that we can properly review the ALJ's determination on appeal"), we are not troubled by the substance of the ALJ's determination. Mr. Andersen's medical tests do not conclusively show the alleged limitations and there was contrary evidence in the record. Accordingly, the ALJ was entitled to give the opinions less than controlling weight. *See Langley v. Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004).

Our conclusion that the ALJ could properly give the opinions less than controlling weight does not end our analysis, however. An ALJ is not entitled to completely reject altogether a treating physician's opinion, without further analysis, when the ALJ does not give it controlling weight. *See id.* Rather, the treating physician's opinion is "still entitled to deference and must be weighed using all of the relevant factors." *Id.* (internal quotation marks and alteration omitted). It is not clear whether the ALJ undertook this distinct responsibility. Indeed, we are not even certain if the "little weight" the ALJ purported to give these opinions was actually some minimal consideration or no weight at all. Regardless, we are not satisfied with the ALJ's proffered reasons.

Although we may not reweigh the evidence, *see Frantz*, 509 F.3d at 1300, we must assure ourselves that the ALJ gave the relevant material due consideration. *See Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). As we have explained, the ALJ must provide sufficient indication of what weight is assigned and "good reasons" for that

weight.  *See Watkins*, 350 F.3d at 1300-01.  Here, the ALJ has failed to offer "good reasons" for giving these opinions "little weight."  The ALJ has failed to satisfy us that all of the § 404.1527(d) factors were properly *considered* and that the apparent rationale for largely disregarding these opinions is sufficient.

With regard to the ALJ's apparent rationales, the ALJ's rejection of these opinions based on their timing is insufficient because the ALJ narrowly construed the relevant evidentiary period.  To qualify for benefits, Mr. Andersen must be found to have become disabled before his insured status expired at the end of 1998.  *See* 42 U.S.C. § 423(a)(1)(A).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical [] impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A).  In light of this criteria, the ALJ should not have treated only the few months surrounding December 1998 as relevant.  Indeed, because Mr. Andersen's underlying medical condition was undisputed and permanent, the ALJ could make inferences about the progression of Mr. Andersen's impairment, relying on earlier medical evidence. *See* SSR 83-20, 1983 WL 31249, at *3 ("The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the

- 15 -

individual from engaging in SGA [substantial gainful activity] . . . for a continuous period of at least 12 months . . . .").[8]  Therefore, to the extent that the attending physician statements were discounted for being from the "remote past," we find this reason insufficient.

We also find that the ALJ's apparent failure to consider any factor other than supportability makes the ALJ's reasoning insufficient.  It is certainly correct to consider the amount of objective support for the conclusions expressed in treating physicians opinions and the reasoning the physicians provide.  *See* 20 C.F.R. § 404.1527(d)(3) (noting that the more a medical source is supported by other findings, the more weight the source is given).  In this case, however, we cannot uphold the ALJ's decision based solely on supportability.  There is no indication that the ALJ considered any relevant factor under § 404.1527(d) other than supportability before assigning these opinions so little weight.  Although supportability might prove determinative, that can only be decided after consideration of the other factors.  These include the fact of examination, the length of the treatment relationship and frequency of examination, and the nature

---

[8]      Furthermore, Dr. Woods's October 1997 opinion cannot be considered "remote" from December 1998.  The ALJ may have relied upon factual error on this point.  The state agency physician read the handwritten date of this opinion as "1992," but other indicia on the form confirm that it must have been later (such as references to treatment in 1993 and a catheterization in 1996).  The record also contains Dr. Woods's examination notes for the same date in 1997, lending further support to the conclusion that the agency physician misread the date as being 1992.

and extent of the treatment relationship. *See* 20 C.F.R. § 404.1527(d)(1)-(2). These factors may not uniformly weigh in favor of Dr. Wren's and Dr. Woods's opinions, but they would not be insignificant here. Regardless, they must be considered. It is true that the ALJ is under no obligation to *explicitly discuss* each factor in the decision. *See Oldham*, 509 F.3d at 1258. However, the ALJ's cursory treatment of the physicians' opinions in this case does not satisfy us that the ALJ *considered* all the relevant factors.

Even if we were persuaded that the ALJ had considered these other factors, the ALJ also applied an incorrect legal standard in assessing supportability. The ALJ appears to have discounted the opinions of Dr. Wren and Dr. Woods because they used forms with check off boxes and little reasoning was articulated on those forms. The Commissioner offers two arguments to support the proposition that doing so was proper. However, we cannot agree.

The Commissioner first argues for a categorical position: the opinions cannot be substantial evidence because these forms were completed without examination findings or treatment notes. Some of these forms do lack such direct explication. Explanatory material is certainly relevant in deciding the weight a treating physician's opinion should receive. *See White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001). However, we are unwilling to categorically reject forms completed by treating physicians that lack such material. Although the Commissioner suggests that this categorical rule is required by precedent, we

cannot agree that our prior cases dictate such an extensive rule.

The Commissioner would broadly apply our statement in *Frey v. Bowen*, that "evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence." 816 F.2d 508, 515 (10th Cir. 1987). However, this holding is not as broad as the Commissioner wishes. In *Frey*, the report "appear[ed] to be based on the most limited sort of contact and examination" with "no indication of careful study of Frey's history or prior examinations." *Id.* In contrast with other doctors' objective tests and measurements, the report at issue in *Frey* "consist[ed] solely of boxes checked on the Secretary's form to indicate his conclusion of no limitation on right arm use." *Id.* In that context, we observed that "findings of a *nontreating* physician based upon limited contact and examination are of suspect reliability." *Id.* (emphasis added).

The Commissioner would have us construe *Frey*'s holding to include any report primarily consisting of check boxes. However, to do so here would expand *Frey*'s exclusion of check-box forms beyond those completed by nontreating physicians. No controlling precedent obliges us to take this path. *See Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (distinguishing *Frey* in part because there we "dealt with a *nontreating* physician's checkmarks on the agency's RFC form" (emphasis added)); *cf. Hamlin*, 365 F.3d at 1223 (applying *Frey*'s rule to an "agency disability determination which listed a non-treating

physician's assessment of [claimant's] RFC"); *Drapeau v. Massanari*, 255 F.3d 1211, 1213-14 (10th Cir. 2001) (applying *Frey*'s rule to a "consultative physician" and other "nontreating physicians who opined that plaintiff's impairments did not meet any listing" without "any supporting explanation whatsoever for their conclusions"). On the facts of this case, we decline to adopt such an expansive interpretation of *Frey*.

"In contrast" to the physician in *Frey*, Dr. Wren and Dr. Woods actually examined the patient (i.e., Mr. Andersen) and recorded their clinical assessments—not on "the agency's checklist RFC form," *Carpenter*, 537 F.3d at 1267—but rather on forms that apparently were designed by Mr. Andersen's disability insurer. These forms did not ask for extensive rationales, or provide significant space for them. Thus, it is not surprising that the two physicians recorded somewhat limited clinical comments. That they did so, however, does not provide a sound foundation for the inference—which the ALJ apparently adopted—that their assessments were of limited reliability, nor does it support the notion that the results that they reported were based upon something less than "a thorough physical examination." *Cf. id.* (noting that "[i]n contrast" to *Frey*, which "dealt with a nontreating physician's checkmarks on the agency's RFC form," the treating physician at issue "made notes or circled the medical terms for her findings on her own medical form clearly set up to record the results of a thorough physical examination; it was not the agency's checklist RFC form").

- 19 -

Furthermore, we note that expanding the *Frey* rule in this case would be particularly ill-advised because, in contrast to *Frey*, there were other materials that could lend support to the conclusions in the forms.[9]  Accordingly, we are not persuaded by the Commissioner's first argument.

The Commissioner's second argument for why these opinions could properly be rejected relies on the non-examining state agency physicians' review of the medical record.[10]  Because the agency's physician reached a conclusion that was inconsistent with Dr. Wren's assessments after a review of numerous other reports in the record, the Commissioner suggests that Dr. Wren's report could be discounted.  Although the non-examining state agency physician may have reviewed Dr. Wren's opinion in the context of other medical evidence and treatment notes,[11] problematically, it is not clear what weight the ALJ gave to the

---

[9]  This supporting material includes: the cardiovascular medical reports Dr. Wren completed in June 1993 and December 1995, the medical evidence to which Dr. Wren was privy (including echocardiograms in May 1993, December 1993, June 1996, and July 1996), and Dr. Wren's and Dr. Woods's examination notes.  It is not clear whether the ALJ considered this material before rejecting these opinions.

[10]  The Commissioner also argues that Dr. Wren's assessments are internally inconsistent.  However, we are not free to supply reasons not relied upon by the ALJ.  *See Robinson*, 366 F.3d at 1084.  Because the ALJ never indicated that Dr. Wren's assessments were internally inconsistent, this argument must be disregarded.

[11]  The first agency physician review occurred on November 10, 2000. Contrary to the treating physicians, this review assessed Mr. Andersen's exertional limits at light work: standing, walking, or sitting six hours in a

(continued...)

agency physician's assessment. "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Hamlin*, 365 F.3d at 1223 (citing 20 C.F.R. § 416.927(f)(2)(ii)). The ALJ did not do so here. The ALJ's only remark about the agency physician's opinion was that the ALJ "concurs with the DDS physician's opinion." Aplt. App. at 18. At bottom, we conclude that the agency physician's assessment is not enough to demonstrate that the ALJ properly discounted Dr. Wren's opinion. Even if we were to reach a contrary conclusion, that would not ameliorate the basic problem addressed above—the failure to consider, or to demonstrate consideration of, the other factors under § 404.1527(d).

Therefore, we conclude that the ALJ did not apply the correct legal standards to these treating physicians' opinions, and further did not provide "good reasons" for giving such "little weight" to these treating physicians' opinions.

---

[11](...continued)
workday; occasional lifting up to twenty pounds; and frequent lifting up to ten pounds. The medical consultant noted that from alleged onset to expiration of insurance "claimant had stable valvular heart disease with minimal objective findings and only sought care for disability form completion." Aplt. App. at 212. The consultant disagreed with the "alleged degree of limitations," stating it was "not supported" because "[t]he EF, physical exams lacking edema or signs of failure and so forth indicate better than alleged function." *Id.* at 216. After compiling one page of notes regarding Mr. Andersen's tests and doctor visits over the years, the consultant dismissed the treating physicians' opinions on the grounds that "[t]hese are simply not substantiated by the objective evidence and are given little weight in this RFC." *Id.* at 217. A second review in March 2001 was more ambivalent, noting that "allegations [are] at least partially credible" but concluding that "[u]nfortunately for this gentleman, we are dealing with a 12/98 DLI" and thus "will have to reaffirm prior decision." *Id.* at 220-21.

## 2. Dr. Hodges's 1999 Assessment

Dr. Charles Hodges apparently became Mr. Andersen's physician in December 1997. *See* Aplt. App. at 120 (noting that Mr. Andersen "is a new patient to me" on Dec. 11, 1997). He saw Mr. Andersen at least three times in 1998 for sinusitis and an embolus in his left eye in addition to ordering or reviewing various heart tests. No assessment is in evidence for 1998, but Dr. Hodges provided one on June 1, 1999. After reviewing an echocardiogram completed on May 24, 1999, Dr. Hodges concluded that Mr. Andersen could work zero hours per day and that he would "never" be able to resume work.

The ALJ characterized Dr. Hodges's assessment as an "attempt[] to retroactively say he is 'disabled,'" and concluded that "there are no clinical reports to show this." Aplt. App. at 20. The ALJ found information on the June 1999 form to be contrary to Dr. Hodges's conclusions because the form indicated that the most recent echocardiogram "shows only mild or moderate symptoms" and Mr. Andersen "is rated as 'ambulatory.'" *Id.*

The ALJ provided no guidance as to what weight was actually assigned to Dr. Hodges's opinion. It can perhaps be inferred that the ALJ entirely rejected it. However, because the ALJ (a) failed to indicate why Dr. Hodges's opinion did not receive controlling weight, (b) failed to specify what weight, if any, was given to Dr. Hodges's opinion, and (c) failed to explain the reasons for either assigning the opinion little weight or rejecting it altogether, "we cannot simply presume the

ALJ applied the correct legal standards." *Robinson*, 366 F.3d at 1083 (internal quotation marks and alteration omitted). We require the ALJ "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion." *Watkins*, 350 F.3d at 1300 (internal quotation marks omitted). And "we cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion." *Id.* at 1301. Thus, we must remand. *See id.*

On the other hand, it is possible to interpret the ALJ's comments as offering reasons for giving the opinion less than controlling weight. Indeed, the ALJ's statements regarding Dr. Hodges's opinion could be seen as pertaining to supportability, one of the six factors that must be considered when assigning a treating physician's opinion less than controlling weight. *See id.* at 1300-01. However, even if we were to look past the ALJ's failure to indicate what weight was given to Dr. Hodges's opinion, we still would have to remand; we could not consider the ALJ's statements to be "legitimate reasons" for discounting the opinion. *See id.* at 1301.

The ALJ appears to have given far too little weight to Dr. Hodges's interpretation of the medical tests. Dr. Hodges noted the results of Mr. Andersen's echocardiogram to be "mild LV [left ventricular] dilatation," "mild LVH [left ventricular hypertrophy]," "moderate global hypokinesis," and "moderate calcific aortic stenosis." Aplt. App. at 100. However, these "mild"

- 23 -

and "moderate" modifiers do not necessarily mean that Mr. Andersen's overall condition is "mild" or "moderate." Nor do they inherently contradict Dr. Hodges's assessment. Similarly, the ALJ was not correct in discounting the opinion because Mr. Andersen was rated "ambulatory." Rating Mr. Andersen as "ambulatory" appears only to confirm that he could walk and was not "House confined," "Bed confined," or "Hosp[ital] confined." *See* Aplt. App. at 100. It does not necessarily indicate that an individual with that rating can work.

Furthermore, the ALJ's perfunctory dismissal of Dr. Hodge's opinion does not convince us that the ALJ even considered any of the other relevant factors. Indeed, although the ALJ parenthetically noted that Dr. Hodges was a treating physician, this notation does not convince us that the ALJ considered the length or extent of the treatment relationship or the frequency of examination, which are two of the relevant factors the ALJ was bound to at least consider. *See* 20 C.F.R. § 404.1527(d)(1)-(2). There is nothing to even suggest that Dr. Hodges's treatment history with Mr. Andersen—spanning more than a year, and including multiple office visits covering the very period that the ALJ considered most relevant—played any role in the ALJ's decision.

Likewise we do not view the ALJ's belief that Dr. Hodges's opinion was an "attempt[] to retroactively say he is 'disabled'" to be a legitimate reason, on these facts, for discounting the opinion. Aplt. App. at 20. Dr. Hodges's assessment is different in kind from situations presenting a "retrospective diagnosis without

evidence of actual disability" that we have previously deemed insufficient. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990) (per curiam). In *Potter*, there was not a single medical report that identified a disability until nearly four years after the expiration of the claimant's insured status. *Id.* at 1347-49. At that time, a treating physician first provided a diagnosis of a progressive disease and then noted that it was "conceivable" that the earlier symptoms were part of this later diagnosis. *Id.* at 1348. In contrast, Mr. Andersen's underlying condition had been diagnosed during the period in which he was insured, and Dr. Hodges's 1999 form offered no attempt to retroactively apply his current assessment to Mr. Andersen's earlier infirmities.

Thus, in addition to being unable to conclude that the ALJ applied the correct legal standards, we also are unable to conclude that any reasons that the ALJ offered were "good," "legitimate" reasons that could support giving Dr. Hodges's opinion little weight.

### 3. Dr. Mackie's 2000 Assessment

In June 1996, Dr. R. William Mackie became Mr. Andersen's cardiologist. Dr. Mackie performed a physical exam and referred Mr. Andersen for an echocardiogram that month. In 1998, Dr. Mackie worked with Dr. Hodges to address Mr. Andersen's left eye embolism that resulted in blindness in that eye. Dr. Mackie also performed eleven more physical exams over a three-year period from 1999 through 2001.

On September 18, 2000, Dr. Mackie completed a RFC assessment. Some of the limitations he marked appear to be somewhat inconsistent. He first indicated that Mr. Andersen could continuously sit for four hours, stand for one hour, and walk for fifteen minutes. He then indicated that during an eight hour workday, Mr. Andersen could only sit for two hours and stand or walk for fifteen minutes. Dr. Mackie marked fatigue and shortness of breath as symptoms that would be "continually" present, and identified all of these limitations as present since May 1993. His explanatory notes are very brief: "Has Heart failure, severe Aortic stenosis and Atrial fib[rillation] s/p embolism [in the left] eye." Aplt. App. at 152.

The ALJ disposed of this opinion very briefly, stating only that it "is very confusing and does not lend much to assist the undersigned in determining claimant's true residual functional capacity" with reference to the contrasting sit/stand/walk time periods. *Id.* at 20. It can perhaps be inferred that Dr. Mackie's opinion also was discounted for completion "well after the date last insured," as the ALJ had noted with regard to Dr. Hodges's 1999 assessment earlier in the same paragraph. *Id.* Again, the ALJ failed to indicate what weight, if any, was given to Dr. Mackie's assessment. Furthermore, focusing on the adequacy of the reasons for giving this assessment less weight, the ALJ neither provided a sufficient explanation for a subsequent reviewer to understand the weight actually assigned, nor provided "good reasons" for rejecting the opinion.

Thus, we must remand. *See Watkins*, 350 F.3d at 1301.

The ALJ's cursory discussion of Dr. Mackie's assessment does not convince us that the ALJ considered the multiple factors that would support giving Dr. Mackie's assessment *some* weight. First, as a cardiologist, he is a specialist in this area, and "[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty . . . ." 20 C.F.R. § 404.1527(d)(5). Furthermore, he had examined Mr. Andersen numerous times, treated Mr. Andersen since 1996, and was familiar with Mr. Andersen's cardiological impairments from physical examination and tests. *See id.* § 404.1527(d)(1)-(2). It is possible that these factors are outweighed by weak support or contrary evidence in the objective medical data, *see id.* § 404.1527(d)(3), but the ALJ does not rely on those grounds.

The confusing nature of Dr. Mackie's responses to some questions on the form also is not grounds for entirely disregarding his opinion. First, the disparity between responses has little effect here—whether the broader or narrower sitting and standing limitations are used, Mr. Andersen would still be limited to sedentary work. *Compare* SSR 83-10, 1983 WL 31251, at *6 (explaining that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday") *with id.* at *5 (explaining that at the sedentary work level, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday"). Second, the differences may

be easily reconcilable upon a closer review of the form Dr. Mackie used.[12]  Third, the ALJ could have contacted Dr. Mackie for clarification, and indeed, the ALJ may have had a duty to do so.  *See White*, 287 F.3d at 908 (noting that the ALJ has a duty to "recontact a treating physician when the information the doctor provides is 'inadequate to . . . determine whether you [the claimant] are disabled'" (quoting 20 C.F.R. § 416.912(e)) (alteration in original)).  *White* clarifies that it is the inadequacy of the "evidence" received from the physician rather than the inadequacy of the record as a whole, or the rejection of the physician's opinion, that gives rise to the duty to recontact a treating physician. *See id.* at 905, 908.[13]  Arguably, the evidence provided in this instance may not have been adequate, or alternatively the ALJ may have had sufficient grounds to reject the opinion.  But when, as here, the sole reason provided for disregarding

---

[12]     For example, Dr. Mackie indicated that Mr. Andersen could—on a continuous basis—stand for one hour and walk for fifteen minutes.  In the next question, he indicated that—during an 8-hour competitive workday—Mr. Andersen would be able to "stand or walk" for fifteen minutes.  Aplt. App. at 149. One reasonable explanation for this difference is that, unlike the first question, the second question lumps together standing and walking, allowing Dr. Mackie to select only one time frame for both activities. Thus, Dr. Mackie's selection of fifteen minutes arguably would still be consistent with his previous answer that Mr. Andersen could only walk for fifteen minutes on a continuous basis.

[13]     The district court erred in relying on *White v. Massanari*, 271 F.3d 1256, 1260-61 (10th Cir. 2001), in stating that the inadequacy of the record triggers a duty to recontact.  *White* was altered on precisely this point upon consideration of the petition for rehearing. *See* 287 F.3d at 904-05.  As the panel clarified, it is not relevant to the recontact question whether "the record as a whole is inadequate."  *Id.* at 905.

the opinion is its confusing nature, we cannot find that reason adequate absent an attempt to recontact the physician.

### 4. Summary

Although the ALJ's conclusion that Mr. Andersen is capable of a limited range of light work ultimately may be correct, the ALJ's failure to indicate the weight that these treating physicians' opinions received, which is itself a failure to apply the correct legal standard, requires us to remand. Furthermore, even if we were to examine the apparent reasons that the ALJ had for giving these opinions less than controlling weight, the analysis in the ALJ's opinion is insufficient for us to be satisfied that "good reasons" have been provided for giving these opinions so little weight. Thus, it is clear that we must remand.

### III. CONCLUSION

For the foregoing reasons, the district court's judgment affirming the ALJ's decision is **REVERSED** and the case is **REMANDED** with instructions to remand to the Commissioner for additional proceedings in accordance with this decision.

Entered for the Court

Jerome A. Holmes
Circuit Judge

05-4305 - *Anderson v. Astrue*

**HARTZ**, Circuit Judge, concurring:

Although I am basically in agreement with the analysis of the district court, I concur in reversal because of the ALJ's failure to explain the apparent decision that medical evidence before 1998 was not relevant. *See* ALJ Op. at 5 ("The medical record during this relevant time period, the latter part of 1998 . . . .").