**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

VIRGINIA MARIE JONES,

Plaintiff-Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner, Social Security
Administration,[*]

Defendant-Appellee.

No. 12-5057
(D.C. No. 4:10-CV-00631-TLW)
(N.D. Okla.)

**ORDER AND JUDGMENT**[**]

Before **ANDERSON** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

---

[*]      In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure,
Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant-appellee in
this action.

[**]      After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Virginia Marie Jones appeals from a district court order affirming the Commissioner's denial of social security disability insurance and supplemental security income (SSI) benefits. We conclude that the Administrative Law Judge (ALJ) did not follow the correct legal standards in evaluating the opinion of Ms. Jones's treating physician or in evaluating Ms. Jones's credibility. We therefore reverse and remand for further proceedings.

Ms. Jones filed an application for disability insurance benefits in May 2007 and protectively filed an application for SSI benefits in April 2006. She alleged that she was disabled due to lower back and neck injuries and migraines beginning January 10, 2006, when she was in a car accident. The agency denied her applications initially and on reconsideration, and the ALJ then denied her benefits after a de novo hearing. Employing the familiar five-step sequential analysis, *see, e.g.*, *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010), the ALJ concluded that Ms. Jones could not perform her past relevant work, but that she did have the residual functional capacity (RFC) to perform other work that exists in significant numbers in the local and national economies. Ms. Jones sought review before the Appeals Council, to which she submitted additional medical evidence. The Appeals Council accepted and considered the additional evidence, but concluded that it did not provide a basis for changing the ALJ's decision. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

*See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). The district court affirmed the Commissioner's decision, and Ms. Jones now appeals.

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson*, 602 F.3d at 1140. "Although we will not reweigh the evidence or retry the case, we meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Id*. (internal quotation marks omitted).

Ms. Jones raises three main issues on appeal: (1) the ALJ erred at step five; (2) the ALJ failed to properly consider the medical source evidence; and (3) the ALJ failed to perform a proper credibility determination.[1] Because we conclude that the second two issues require reversal and remand, we address them first.

Evaluation of Medical Source Evidence

The medical record in this case is extensive and we will describe it only briefly. In January 2006, while living in Florida, Ms. Jones was involved in a car

---

[1] Ms. Jones also raises a variety of sub-issues. Some of those sub-issues were not raised in the district court, so we will not consider them. *See Crow v Shalala*, 40 F.3d 323, 324 (10th Cir. 1994).

accident.  Early diagnosis of her injuries included posttraumatic headaches, a cervicothoracic strain, a right shoulder injury, and a lumbosacral strain.  Subsequent diagnoses included cervical strain, lumbosacral strain, and posttraumatic headaches.

Shortly after her accident, Ms. Jones began treatment with Florida Medical Associates, where she saw three practitioners:  Frank S. Alvarez, Jr., M.D. (a neurologist); Carol L. Krause, M.D. (a pain management specialist); and Harry Vassilakis, D.C. (a chiropractor).  Ms. Jones saw Dr. Vassilakis several times a week for a variety of treatments, including massage, spinal manipulation, electrical nerve stimulation, and—later—acupuncture.  During the first ten months, she saw both Dr. Alvarez and Dr. Krause at least once a month.  She received trigger-point injections from Dr. Alvarez and worked with Dr. Krause on mind-body pain-control techniques and mobilization exercises.  Ms. Jones's treatment with this practice continued through early April 2008, though she did not see Dr. Vassilakis between April and September of 2006 and she did not see Dr. Alvarez between November 2006 and February 2008.

During the 2½ years she was treated at this practice, Ms. Jones was prescribed a variety of narcotic pain-relievers, muscle relaxers, and sleep aids to be taken on a daily basis.  She consistently complained of lower back pain, but the frequency and intensity of her mid-back and neck pain, as well as of her headaches, varied. Dr. Alvarez repeatedly restricted Ms. Jones's work activities, and Dr. Krause recited those restrictions and others in her treatment notes.

The record does not show that Ms. Jones received any treatment between early April 2008 and late December 2008, when she began treatment with Dr. Henson, D.O. She saw him at least once a month from December 2008 through June 2009. He consistently diagnosed claimant with lumbosacral strain and myofasciitis, cervical ligamentous strain, right sciatica, and insomnia, among other conditions. And he, too, prescribed a narcotic pain-reliever, a muscle relaxer, and a sleep aid to be taken on a daily basis.

In September 2009, while visiting family in Oklahoma, Ms. Jones was involved in another car accident. She suffered a broken arm, a broken ankle, and a cardiac contusion. Shortly after the accident, she began treatment with Dr. Ree at the Omni Medical Group in Oklahoma. He, too, prescribed narcotic pain-relievers, a muscle relaxer, and a sleep aid to be taken on a daily basis. Dr. Ree also referred Ms. Jones to an orthopedic specialist, and she was treated by Dr. Nebergall in October and November 2009. The last medical records Ms. Jones provided the ALJ date from this period. She continued to be treated by Dr. Ree, however, and she submitted additional treatment records to the Appeals Council covering the period from December 2009 through May 3, 2010.

The ALJ found that Ms. Jones was last insured for benefits on March 31, 2009, so she had to show that she was disabled as of that date to obtain disability insurance benefits. To obtain SSI benefits, however, she had only to show that she was disabled as of April 21, 2010, the date of the ALJ's decision.

Ms. Jones was still recovering from the injuries she sustained in the September 2009 accident at the time of the hearing before the ALJ on March 31, 2010. Based on the medical evidence before her, the ALJ concluded that any impairments flowing from Ms. Jones's broken arm or ankle were not likely to remain severe for the required twelve-month period. The ALJ therefore assigned no functional limitations to these injuries. Ms. Jones does not challenge this determination on appeal.

The ALJ found that Ms. Jones's cervical and lumbar strains and her migraine headaches were severe impairments. She further found that, despite these impairments, Ms. Jones had the RFC for light work, with some additional limitations. The ALJ concluded that Ms. Jones could

> lift/carry ten pounds frequently and twenty pounds occasionally, stand/walk for six hours of an eight hour work day, sit for six hours of an eight hour work day, and push/pull ten pounds frequently and twenty pounds occasionally, she should only occasionally balance, stoop, kneel, crouch, crawl, or climb, never using ropes, ladders or scaffolds. She should only occasionally reach overhead bilaterally, and she should avoid concentrated exposure to all hazards.

Aplt. App., Vol. 2, at 17. This RFC determination was consistent with the July 2007 RFC determination of Dr. Puestow, the non-examining agency physician who reviewed the medical records for the initial consideration of Ms. Jones's claims, but it was inconsistent with the September 2007 RFC determination of Dr. Krause, who concluded that Ms. Jones was much more limited. The ALJ gave only "some weight" to Dr. Krause's opinion, but gave "great weight" to Dr. Puestow's opinion. *Id.* at 22, 23.

Ms. Jones challenges the ALJ's assessment of these conflicting opinions. While we may not reweigh this evidence, we can examine whether the ALJ followed the correct legal standards in evaluating the medical evidence and whether substantial evidence supports her determination.

Guided by SSR 96-2p and the pertinent regulations, this court has laid out a sequential analysis an ALJ should follow in evaluating treating physician opinions. *See Watkins*, 350 F.3d at 1300-01. First, the ALJ must decide whether the opinion is entitled to controlling weight. For this, she "must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at 1300 (internal quotation marks omitted). If it is not, then the opinion is not entitled to controlling weight. If it is, then the ALJ must further determine whether the opinion is "consistent with other substantial evidence in the record." *Id.* We have held that an ALJ must make a finding as to whether the physician's opinion is entitled to controlling weight "so that we can properly review the ALJ's determination on appeal." *Id.*

If the ALJ decides that the treating physician's opinion is not entitled to controlling weight, she must then decide what weight to give the opinion. In making this decision, the ALJ should consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the

area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (internal quotation marks omitted). "After considering the pertinent factors, the ALJ must give good reasons in [the] notice of determination or decision for the weight [she] ultimately assigns the opinion." *Id.* (first alteration in original) (internal quotation marks omitted). The ALJ does not have to explicitly discuss each of the six relevant factors in deciding what weight to give a medical opinion; indeed, not all may be relevant in a particular case. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). The ALJ must, however, provide good reasons that are sufficiently specific to permit meaningful judicial review. *Watkins*, 350 F.3d at 1300.

The ALJ here did not perform the first step in the sequential analysis: she did not decide whether Dr. Krause's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques and, if so, whether it was consistent with other substantial evidence in the record. She did decide what weight to give Dr. Krause's opinion, but we conclude she did not provide good reasons for the weight she assigned.

The ALJ described the weight she gave to Dr. Krause's opinion as follows: "Based on the objective medical evidence that establishes the severity of the claimant's impairments, and the following other factors, I give some weight to Dr. Krause's treating source opinion, to the extent it is consistent with my finding of the claimant's residual functional capacity indicated above." Aplt. App., Vol. 2, at 22. The first part of this sentence suggests that the ALJ may have thought the

objective medical evidence did not support the functional limitations determined by Dr. Krause, but it does not actually say so or explain why. And it is not clear from the ALJ's decision what "other factors" were that led her to give only some weight to Dr. Krause's opinion.

The ALJ gave only one specific reason for discounting Dr. Krause's opinion, and that reason related to only one part of the opinion. The ALJ found that Dr. Krause's answers to the questions on the RFC form about Ms. Jones's manipulative functional limitations—her ability to handle, finger and feel—were internally inconsistent. While the apparent inconsistency may well have been the result of a confusing form, and another, arguably more sensible, reading could be given to Dr. Krause's answers,[2] "[w]e may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Oldham*, 509 F.3d at 1258 (alteration in original) (internal quotation marks omitted).

Even so, the apparent inconsistencies in Dr. Krause's opinion of Ms. Jones's manipulative functional limitations do not provide a basis for rejecting her opinion of Ms. Jones's other functional limitations. Dr. Krause found that Ms. Jones could "stand and/or walk" for less than two hours in an eight-hour day and could stand for

---

[2]      As Ms. Jones contends in her brief, it is possible to read Dr. Krause's comments in a manner that makes them internally consistent and logical, to wit: Ms. Jones can only occasionally reach and can frequently handle, finger, and feel, except when her arms are away from her body, at which time she can only occasionally handle, finger and feel.

only fifteen minutes before needing to sit; she has a limited ability to sit and must periodically alternate between sitting and standing; and she has a limited ability to push and/or pull in her upper extremities. Aplt. App., Vol. 3, at 505-06. The Commissioner suggests a variety of reasons why it was appropriate for the ALJ to discount Dr. Krause's opinion, but the ALJ did not rely on those reasons herself, so neither may we. We must evaluate the ALJ's decision "based solely on the reasons stated in the decision." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (per curiam).

What makes the ALJ's lack of express reasoning especially problematic is that she accepted the opinion of the agency's non-examining physician over the opinion of a physician who treated claimant regularly for 2½ years. "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Id.* While she may have given an adequate explanation for accepting Dr. Puestow's opinion about claimant's manipulative limitations over that of Dr. Krause, the ALJ did not provide a sufficient reason for rejecting Dr. Krause's opinion about Ms. Jones's other functional limitations in favor of Dr. Puestow's opinion. "[A]bsent a legally sufficient reason for doing so," the ALJ erred by rejecting the opinion of a treating physician in favor of the opinion of a non-examining physician. *Id.*

Ms. Jones also argues that the ALJ erred in interpreting Dr. Puestow's opinion as limiting only her ability to reach overhead, and not her ability to reach in all directions. We see no error. The ALJ's interpretation of Dr. Puestow's opinion, when read as a whole, was reasonable.

Evaluation of Ms. Jones's Credibility

Ms. Jones argues that the ALJ did not apply the correct legal standards in evaluating her credibility and that substantial evidence does not support the ALJ's assessment. "Credibility determinations are peculiarly the province of the finder of fact" and we will uphold the ALJ's determination if it is supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks omitted). But an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in making a credibility determination. SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. 1996). Credibility findings must be "closely and affirmatively linked to substantial evidence." *Kepler*, 68 F.3d at 391 (internal quotation marks omitted).

In accordance with the pertinent regulations, SSR 96-7p provides that, in addition to the objective medical evidence, the ALJ must consider the following factors in evaluating a claimant's credibility:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

- 11 -

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004).[3]

Ms. Jones complains that the ALJ failed to discuss some of these relevant factors and failed to give good reasons to discount her credibility. In particular, she argues that the ALJ failed to consider the severity and frequency of her pain, the efforts she took to relieve her symptoms, her consistent use of narcotic pain-relievers and of muscle relaxers, her very limited daily activities, and the fact that none of her treating physicians ever suggested that she was exaggerating her complaints of pain. Ms. Jones also challenges the validity of some of the reasons the ALJ gave for discounting her credibility.

---

[3]    We have also listed other factors that may be relevant in assessing the credibility of the claimant's allegations of pain, including "'the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence.'" *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991).

Assessing the adequacy of the ALJ's credibility determination is somewhat complicated by the fact that Ms. Jones was still suffering from the effects of her September 2009 car accident at the March 2010 hearing. While Ms. Jones's attorney sometimes focused her questions specifically on the period before that accident, many of Ms. Jones's descriptions of her pain and limitations appeared to relate to her condition at the time of the hearing. Further complicating the matter is the fact that Ms. Jones had to establish that she was disabled by March 31, 2009, for purposes of disability insurance benefits, but she had only to establish that she was disabled as of the date of the ALJ's decision for purposes of SSI benefits.

The ALJ discounted Ms. Jones's credibility based on what she saw as several inconsistencies in Ms. Jones's testimony. First, she found that Ms. Jones's description of the severity of her pain at the hearing was inconsistent with her report to Dr. Alvarez on April 3, 2008, that she had not had any headaches in the last month and that her "neck, mid, and low-back pains intermittently are slightly better." Aplt. App., Vol. 3, at 516. When an ALJ relies on a claimant's statement about her condition on a single occasion as a basis for assessing her condition over a greater time period and then uses that assessment to discount the credibility of the claimant's testimony, we must carefully examine the record as a whole to ensure that substantial evidence supports the ALJ's reliance on the claimant's statement in this fashion.

Here, the medical record as a whole supports the ALJ's reliance on Ms. Jones's April 2008 report to Dr. Alvarez that her headaches were lessening. For

- 13 -

the first two years after the January 2006 car accident, Ms. Jones complained of headaches on and off, but after April 2008, the medical records do not contain any complaints of headaches. Ms. Jones testified at the hearing that she had had only one migraine in the past three months because the medication she was taking for her injuries from the second car accident kept them at bay. Because Ms. Jones's report to Dr. Alvarez of lessening headaches appears to be consistent with the medical record as a whole, the ALJ's reliance on her statement as a basis for discounting her testimony of disabling migraines is well-supported.

The same cannot be said of Ms. Jones's back and neck pain. During the 2½ years she was treated by the doctors at Florida Medical Associates, Ms. Jones consistently complained of fairly intense low back pain, while the intensity of her neck and mid-back pain varied, sometimes disappearing for a month or more, but then returning. Unlike her complaints of headache, however, Ms. Jones's complaints of both lower back and neck pain persisted throughout her treatment with Dr. Henson from December 2008 through June 2009. Thus, even if her statement to Dr. Alvarez in April 2008 that her back and neck pains "intermittently are slightly better," *id.*, could reasonably be viewed as inconsistent with her hearing testimony (which is questionable), the record does not support relying on that isolated statement as a basis for discounting Ms. Jones's testimony of severe back and neck pain.

The ALJ also found that Ms. Jones's description of her pain was "inconsistent with her activities such as exercise and school." *Id.*, Vol. 2, at 22. The exercise to

which the ALJ referred was Ms. Jones's statement to Dr. Krause in June 2007 that "[s]he has been trying to do some more exercise with walking. She is also doing some TheraBand exercises that the chiropractor gave her." *Id.*, Vol. 3, at 501. Both the walking and the TheraBand exercises were specifically prescribed by Ms. Jones's treating physicians. Her efforts to follow the regimen prescribed by her doctors can hardly provide an appropriate basis on which to discount her allegations of pain. And, in any event, her report in June 2007 that she was trying to do the prescribed exercises does not appear to undercut her testimony in May 2010 that she suffers disabling pain.

The ALJ also found that Ms. Jones's testimony "that she is unable to sit at a desk and look down for ten or fifteen minutes at a time is inconsistent with the fact that she reported to treating physicians on numerous occasions that she was going to school to get her GED." *Id.*, Vol. 2, at 22-23. In November 2006, Dr. Krause recommended that Ms. Jones go to vocational rehab and think about getting a GED so she could be retrained for work that was not as physically demanding as her past work. At the next visit, Dr. Krause reported that Ms. Jones told her she had been going to the library to work on her GED. Dr. Krause reported again in January, February, March, and April 2007 that Ms. Jones said that she was continuing to work on her GED. In June 2007, Dr. Krause reported that Ms. Jones was "going to school," *id.*, Vol. 3, at 501, but the following month she said only that Ms. Jones was working on her GED.

The ALJ asked Ms. Jones at the hearing whether she had ever received her GED, and Ms. Jones said that she had not, because she could not afford it. She denied telling Dr. Krause that she was going to school, explaining that she had said only that she wanted to go to school and get her GED, but she never actually did. *Id.*, Vol. 2, at 51.

The ALJ apparently did not believe Ms. Jones's testimony that she never actually went to school to get her GED. But even if Dr. Krause's reports were accurate, they do not contain any information about the physical demands that studying for her GED made on Ms. Jones. When asked at the hearing whether she would have trouble sitting at a desk and looking down, Ms. Jones replied that she could probably sit at a desk and look down for ten to fifteen minutes, but would have to get up and pace a bit before she could sit back down, and that constantly having to hold her head in one position would make her neck hurt. The ALJ apparently assumed that Ms. Jones could not have studied for her GED for six months in 2007 if she actually had these limitations,[4] but there is no evidence in the record to support that assumption.

Finally, the ALJ found Ms. Jones's testimony that, after sitting for about twenty minutes, she would have to get up and pace for about ten minutes before sitting again, and that she did this day and night, was "inconsistent with the assertion

---

[4] Further, it appears that Ms. Jones was describing the limitations she had at the time of the hearing, not necessarily those she had in early 2007.

that she is only able to stand for fifteen minutes at a time before she needs to sit," *id.* at 22. But pacing is not standing still, and when asked whether she paced quickly or slowly and whether she had any problems walking, Ms. Jones replied: "I don't have any problems walking. I pace real slow." *Id.* at 44. When asked about standing in one place, however, Ms. Jones said she could do so for only ten or fifteen minutes before her lower back and neck would hurt. *Id.*

Thus, many of the reasons the ALJ gave for discounting Ms. Jones's credibility are not well-supported by the record. Moreover, the ALJ failed to discuss a variety of evidence that supported Ms. Jones's allegations of pain. For instance, the record shows that Ms. Jones consistently sought treatment to relieve her pain. She saw physicians regularly, and she tried a host of treatments, including hot and cold packs, massage, spinal manipulation, electric nerve stimulation, ultrasound, trigger-point injections, acupuncture, exercises, and mind-body pain-control techniques.

Ms. Jones also took prescription pain-relievers (most of them narcotic), muscle-relaxers, and sleep-aids. The ALJ did mention that Ms. Jones was taking Percocet, Soma, and Trazodone daily at the time Dr. Krause examined her on May 4, 2007, but the ALJ did not acknowledge that Ms. Jones was regularly prescribed these and similar drugs from January 2006 through March 2010.

The ALJ made one other mention of Ms. Jones's medications, but only to discount, rather than support, Ms. Jones's credibility. The ALJ noted that Ms. Jones

testified that she took what the ALJ described as "the powerful narcotic Morphine four times a day for her pain as prescribed," *id.* at 23, and that her list of current medications showed Dr. Ree prescribed morphine sulfate on March 24, 2010. But the ALJ then observed that the only records she had from Dr. Ree (referring to his September 28, 2009, examination) "showed a physical examination in which the claimant had normal range of motion in the neck, with no stiffness or tenderness to palpitation, normal range of motion in the back, with no point tenderness, normal muscle strength and tone, and normal reflexes." *Id.*

It is not clear whether the purpose of the ALJ's observation was to suggest that Ms. Jones was not being truthful when she said that she was taking morphine, or to suggest that Ms. Jones did not need as powerful a pain medication as was prescribed. To the extent the ALJ doubted the truth of Ms. Jones's testimony, the treatment records Ms. Jones submitted to the Appeals Council from December 2009 through May 2010 did show that Dr. Ree prescribed morphine for Ms. Jones's pain, but those records were not before the ALJ. To the extent the ALJ did not think Ms. Jones required such a powerful pain-reliever, that is a medical judgment outside the province of an ALJ. The records from Dr. Ree that the ALJ did have showed that Dr. Ree prescribed two other narcotic pain-relievers—both Percocet and Hydrocodone, together—as well as a muscle relaxer and a sleep aid for Ms. Jones's complaints of pain, so *he* evidently judged that Ms. Jones required significant pain-relief.

- 18 -

Ms. Jones's description of her very minimal activities of daily living also supported her complaints of disabling pain. Although Ms. Jones was not questioned on this point at the hearing, other evidence in the record indicated that she was still staying with her parents in Oklahoma at the time of the hearing, her condition after her second car accident having prevented her from returning to her home in Florida. The ALJ did describe most of Ms. Jones' testimony about the limitations on her daily activities,[5] but the ALJ did not mention any of these limitations in her assessment of Ms. Jones's credibility. In that assessment, the ALJ discussed only the evidence she thought undermined Ms. Jones's credibility.

We have held that an ALJ "need not make a formalistic factor-by-factor recitation of the evidence" when making her credibility assessment, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (internal quotation marks omitted), but she should "discuss the significantly probative evidence supporting claimant's

[5]     Ms. Jones testified that she was able to drive after her January 2006 accident but could not currently drive due to her broken arm. She said that she had trouble putting on her pants and shoes and that her parents had to help her get in and out of the bathtub. She testified that her parents also helped with the housework; pushing a vacuum was too hard, and though she had been able to sweep the floor before her September 2009 accident, she could no longer do so because of her broken arm. Ms. Jones said that her mother did her laundry and went with her to the grocery store, where she would tell her mother what she wanted and her mother would get it for her. Ms. Jones testified that she did no socializing, belonged to no clubs, and did not attend church. She said that she left the house only to go grocery shopping or visit the doctor and that she usually stayed at home six days a week. When asked if she got dressed on the days she stayed in, she said that she wore her nightgown most of the time. Because most of her testimony about her daily activities related to her limitations since the September 2009 accident, it is difficult to discern what she was able to do before that time.

allegations upon which [s]he chose not to rely," *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004); *see also Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."). In *Hardman*, this court concluded that "[i]t was error for the ALJ to fail to expressly consider claimant's persistent attempts to find relief from his pain, his willingness to try various treatments for his pain, and his frequent contact with physicians concerning his pain-related complaints." 362 F.3d at 680. The ALJ here likewise failed to discuss significantly probative evidence that supported Ms. Jones's allegations.

We recently held that we must "exercise common sense" in reviewing an ALJ's decision and must not "insist on technical perfection." *Keyes-Zachary*, 695 F.3d at 1166. If "we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Id.* But the ALJ's omissions here go beyond the merely technical and call into question the ALJ's application of the appropriate legal standards. The ALJ failed to expressly consider the uncontroverted evidence that Ms. Jones routinely consulted physicians, tried all kinds of pain-relieving treatments, and consistently took narcotic pain-relievers and prescription muscle-relaxers in an attempt to alleviate her pain. The ALJ also failed to expressly consider Ms. Jones's testimony about her very

limited activities of daily living in assessing her credibility.  And balanced against these omissions is the fact that many of the grounds upon which the ALJ did rely in discounting Ms. Jones's credibility are not well-supported by the record.  Accordingly, we must reverse and remand for the ALJ to make a new credibility determination that follows the correct legal standards and takes into account the entire record.

Step Five Analysis

Ms. Jones captions her final issue as a challenge to the ALJ's step-five analysis, but some of the arguments she makes implicate earlier steps in the sequential analysis.  In addition to challenging the hypothetical questions the ALJ posed to the vocational expert (VE), and the consistency of the VE's answers with information provided in the Dictionary of Occupational Titles, which are step-five issues, Ms. Jones also argues that the ALJ failed to "assess the severity of [her] consistently diagnosed 'cervicothoracic strain' and related problems with her mid to upper back and trapezius muscle," Aplt. Br. at 23, which implicates step two, and that the ALJ failed to consider these impairments when determining Ms. Jones's RFC at step four.  She also contends that the ALJ failed to recognize evidence that she suffered from a mental impairment, to develop the record about this impairment, or to include the impairment in her RFC determination, all of which implicate earlier steps in the sequential analysis.  Because we are remanding for the ALJ to correct errors

earlier in the sequential analysis, we will not address the arguments that truly relate to step five. We will, however, briefly address those that relate to earlier steps.

Following her accident in January 2006, Ms. Jones experienced pain and limited range of motion not only in her lower back and neck, but also in her mid- to upper-back and shoulder. The ALJ did not address these problems separate from Ms. Jones's neck and lower back problems. The Commissioner argues that the ALJ did not have to address these impairments because they caused no functional limitations independent of those the ALJ found were caused by her neck and lower back impairments. The ALJ did not make such a determination, however, and on remand, she should consider whether Ms. Jones had any impairments related to her mid- to upper-back or shoulder and, if so, whether they were severe. The ALJ should then consider those findings when determining Ms. Jones's RFC. *See* SSR 96-8p, 1996 WL 374184, *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").

Ms. Jones additionally contends that the record contains evidence of a mental impairment—namely, depression—that the ALJ should have recognized, developed the record about, and included in her RFC assessment. We see no error. Ms. Jones was represented by counsel during all of the administrative proceedings. She did not allege any mental impairment in her applications, her disability report, or her hearing testimony. Her attorney told the ALJ at the start of the hearing that Ms. Jones had

impairments of her back and neck and suffered from migraines, and Ms. Jones testified only about her headaches and physical impairments. When asked by the ALJ, both Ms. Jones and her attorney said that they had nothing further to add. While the record does show that Ms. Jones was prescribed medications that may be used to treat depression, it also shows quite clearly that these medications were prescribed strictly as a sleep aid, to be taken only at bedtime. Ms. Jones argues that the ALJ should have been able to discern from her description of her limited daily activities that she suffered from depression. But it is not the ALJ's province to make a medical diagnosis.

> Several preconditions inform an ALJ's duty to develop the administrative record. Under normal circumstances, the ALJ may reasonably rely on counsel to identify the issue or issues requiring further development. Moreover, a claimant need not only raise the issue she seeks to develop, but that issue must also be substantial on its face. Specifically, the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists.

*Wall*, 561 F.3d at 1063 (citations omitted) (internal quotation marks omitted). The evidence did not suggest a reasonable possibility that Ms. Jones had a mental impairment, so the ALJ had no duty to develop the record, to assess the severity of any mental impairment, or to include a mental impairment in her RFC determination.

The judgment of the district court is reversed and the matter is remanded for further proceedings consistent with this order and judgment.

Entered for the Court


Stephen H. Anderson
Circuit Judge